IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EZ LUBE, LLC, *et al.*,[1] | ) | Case No. 08-13256 (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**MOTION TO APPROVE INTERIM ORDER (I) AUTHORIZING
THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT
TO 11 U.S.C. § 364, (II) AUTHORIZING THE DEBTORS' LIMITED
USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363,
(III) GRANTING ADEQUATE PROTECTION TO PRE-PETITION
FIRST LIEN LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (IV)
SCHEDULING THE FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

EZ Lube, LLC ("EZ Lube"), and Xpress Lube-Tech, Inc. ("Xpress," collectively,

the "Debtors" or the "Loan Parties"), each a debtor in possession in the above-captioned chapter

11 cases (collectively, the "Cases"), pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2) and

364(c)(3) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy

Code") and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") hereby move the Court on an expedited basis for entry of the Interim Order

attached hereto as Exhibit A (the "Interim Order") and, ultimately, at a final hearing to be set by

the Court (the "Final Hearing"), a final order as set forth herein (the "Final Order") seeking,

without limitation, the following relief:

1.      Entry of the Interim Order and the Final Order:

---

[1]  The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are: EZ Lube, LLC (6472) and Xpress Lube-Tech, Inc. (3770).  The address for both Debtors is 35065 W. Lake Center Drive, Suite B, Santa Ana, CA 92704.

a.       Authorizing the Debtors to obtain a senior secured post-petition line of credit in an aggregate principal amount not to exceed $62,476,490 (the "DIP Facility") (with $2.5 million available on an interim basis), pursuant to section 364 of the Bankruptcy Code from Goldman Sachs Specialty Lending Group, L.P. ("GSSLG") as agent (in such capacity, the "DIP Agent"), for itself or an affiliate of GSSLG to be indentified and/or other financial institutions selected by GSSLG ("DIP Lenders"), pursuant to the terms of the Interim Order and the DIP Credit Agreement by and among the Debtors, the DIP Agent, and the DIP Lenders, in substantially the form attached to this Motion as Exhibit B (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"),[2] and any related documents required to be delivered by or in connection with the DIP Credit Agreement (collectively, the "DIP Credit Documents");

b.       Authorizing the Debtors to execute and enter into the DIP Credit Documents and to perform such other and further acts as may be required in connection with the DIP Credit Documents;

c.       Granting security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent, for the benefit of itself and the DIP Lenders, to secure all obligations of the Debtors under and with respect to the DIP Facility;

---

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order.

       d.      Authorizing the Debtors' limited use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), on the terms and conditions set forth in the Interim Order and in the DIP Credit Agreement;

       e.      Granting adequate protection to the Pre-Petition Lenders (as hereinafter defined), whose liens and security interests are being primed by the DIP Facility; and

       f.      Modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Agent, and the DIP Lenders to implement the terms of the Interim Order.

       2.      Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), setting an emergency interim hearing (the "Interim Hearing") on the Motion be held for the Court to consider entry of the Interim Order, which authorizes the Debtors to borrow under the DIP Credit Documents, on an interim basis, up to an aggregate principal amount not to exceed $2,500,000.

       3.      Requesting, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), that this Court (i) schedule the Final Hearing on the Motion within thirty (30) days of the Petition Date (as hereinafter defined) to consider entry of the Final Order authorizing the balance of the borrowings under and approving the terms of the DIP Credit Documents on a final basis, and (ii) approve notice procedures with respect thereto.

       4.      Finding, pursuant to Bankruptcy Rule 4001(c)(1), that notice of the Interim Hearing given to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) the Debtors' pre-petition and postpetition lenders or their counsel; and

(iii) the Debtors' thirty-five largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions (collectively, the "Notice Parties") was good and sufficient under the particular circumstances and no other or further notice is or shall be required; and

5.      Scheduling, pursuant to Bankruptcy Rule 4001, the Final Hearing to consider entry of the Final Order authorizing the Debtors to use Cash Collateral and obtain, on a final basis, the DIP Loan under the DIP Credit Documents.

6.      In support of this Motion, the Debtors rely on the *Declaration of Stephen V. Coffey, Chief Restructuring Officer of the Debtor, in Support of First Day Motions* (the "Coffey Declaration"), filed concurrently herewith.

7.      In further support of this Motion, the Debtors represent as follows:

### Jurisdiction and Venue

8.      The Court has jurisdiction over this motion pursuant to sections 157 and 1334 of title 28 of the United States Code (the "Judicial Code"). This is a core proceeding pursuant to section 157(b)(2) of the Judicial Code. Venue for proceedings on this motion is proper in this district pursuant to section 1409 of the Judicial Code.

9.      The Debtors commenced these chapter 11 cases (the "Cases") by the filing of voluntary petitions on December 8, 2008 (the "Petition Date"). The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.      No request has been made for the appointment of a trustee or an examiner in this case, and no official committee has yet been appointed by the U.S. Trustee.

**Statement of Facts**

11.    The background for this Motion is set forth in the Coffey Declaration.

**1.    First Lien Credit Arrangement**

12.    EZ Lube, GSSLG as administrative agent, collateral agent, lead arranger,
syndication agent and document agent for itself (the "First Lien Agent") and as a lender, and
certain other lenders (together with GSSLG, the "First Lien Lenders") are parties to that certain
Amended and Restated Credit Agreement, dated as of December 13, 2005 (as amended,
modified and/or supplemented from time to time and together with the related Security
Agreement and other documents, the "First Lien Credit Documents"). EZ Lube's obligations
under the First Lien Credit Documents are secured by substantially all of its assets. Pursuant to
the First Lien Credit Documents, EZ Lube was provided with aggregate borrowings of up to $57
million, consisting of a five year revolving credit facility of up to $17 million in revolving credit
loans and letters of credit and a five-year term loan of $40 million (the "First Lien Term Loan").
Xpress is a guarantor of EZ Lube's obligations owed under the First Lien Credit Documents, and
has granted the First Lien Lenders a senior security interest in substantially all of its assets. As
of the Petition Date, the Debtors owed approximately $16 million under the Revolver and
approximately $37.5 million under the First Lien Term Loan and guaranty (the "First Lien
Obligations").

**2.    Second Lien Credit Arrangement**

13.    EZ Lube as borrower, Hudson Straits CLO 2004, Ltd. ("Hudson Straits");
Gale Force 1 CLO, Ltd. ("Gale Force 1"); Foxe Basin CLO 2003, Ltd. ("Foxe Basin"); GSO

Credit Opportunities Fund (Helios), LP ("GCOF"); GSO Special Situations Overseas Master

Fund, Ltd. ("GSSOMF"); the collateral manager for Hudson Straits, Gale Force 1, and Foxe

Basin, GSO Debt Funds Management, LLC; and the investment manager for GCOF and

GSSOMF, GSO Capital Partners, LP (collectively, the "Second Lien Lenders") are parties to that

certain Second Lien Credit Agreement dated as of December 13, 2005 (as amended, modified

and/or supplemented from time to time and together with the related Security Agreement and

other documents, the "Second Lien Credit Documents"). Pursuant to the Second Lien Credit

Documents, EZ Lube was provided with a seven-year term loan of $35 million (the "Second

Lien Term Loan"). As of the Petition Date, the Debtors owed approximately $27.8 million under

the Second Lien Term Loan (with interest accrued thereon, the "Second Lien Obligations" and

collectively with the First Lien Obligations, the "Pre-Petition Obligations")). The obligations

under the Second Lien Credit Documents are secured by substantially all of the Debtors' assets

and are junior only to the liens provided under the First Lien Credit Documents (the "Second

Lien Collateral" and collectively with the First Lien Collateral, the "Pre-Petition Collateral").

Xpress is a guarantor of EZ Lube's obligations owed under the Second Lien Credit Documents

and has granted the Second Lien Lenders a security interest in substantially all of its assets junior

only to the liens granted pursuant to the First Lien Credit Documents.

### 3.    The Intercreditor Agreement

14.    The First Lien Lenders' and Second Lien Lenders' respective rights vis-à-

vis each other are set forth in an Intercreditor Agreement dated as of December 13, 2005 (as

amended from time to time, the "Intercreditor Agreement").

4.    **Acknowledgments**

15.    The Debtors believe that all First Lien Credit Documents executed and delivered by the Debtors to the First Lien Agent are valid and enforceable by the First Lien Agent and the First Lien Lenders against each of the Debtors. The First Lien Agent duly perfected its liens upon and security interests in the Pre-Petition Collateral by, among other things, filing financing statements, mortgages and fixture filings and, where necessary, by possession of relevant instruments, certificates, or other property. All of such financing statements, mortgages and fixture filings were validly executed by authorized representatives of the Debtors.

16.    The Debtors believe that the liens and security interests of the First Lien Lenders in the First Lien Collateral, as security for the First Lien Obligations, constitute valid, binding, enforceable and perfected first and second priority liens and security interests and are not subject to avoidance, disallowance, subordination or recharacterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

17.    The Debtors further believe that (i) the First Lien Obligations constitute legal, valid and binding obligations of each of the Debtors, (ii) no offsets, defenses or counterclaims to the First Lien Obligations exist, and (iii) no portion of the First Lien Obligations is subject to avoidance, disallowance, reduction, subordination or recharacterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors irrevocably waive any right to challenge or contest the liens of the First Lien Lenders in the First Lien Collateral or the validity of the First Lien Obligations.

18.     The Debtors further believe that they have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the First Lien Agent or any First Lien Lender with respect to any of the First Lien Credit Documents, whether arising at law or at equity, including, without limitation, any re-characterization, subordination, avoidance or other debtor claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.

19.     As indicated, the Debtors further believe that, as of the Petition Date, they were truly and justly indebted to the First Lien Lenders pursuant to the First Lien Credit Documents, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $52.5 million in respect of loans made and letters of credit issued by the First Lien Lenders pursuant to and in accordance with the terms of the First Lien Credit Documents, plus all accrued or hereafter accruing and unpaid interest thereon and any additional fees and expenses (including any professional fees and expenses that are chargeable or reimbursable under the First Lien Credit Documents) now or hereafter due under the First Lien Credit Agreement and the other First Lien Credit Documents.

## A.     Need for the DIP Loans and Use of Cash Collateral

20.     The Debtors believe they have an immediate and critical need to obtain incremental post-petition financing under the DIP Facility and to use cash collateral (as defined in § 363 of the Bankruptcy Code, "Cash Collateral") in order to implement an orderly operation of the Debtors' businesses and sale of the Debtors' assets. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and the incurrence of

incremental post-petition financing under the DIP Facility and the terms of the Interim Order is vital to maximizing the value of the Debtors' estates in an orderly chapter 11 liquidation. Consequently, without the continued use of Cash Collateral and access to the DIP Facility, to the extent authorized pursuant to the Interim Order, the Debtors and their estates would suffer immediate and irreparable harm because they could not continue to operate.

21.    The use of Cash Collateral alone would be insufficient to meet the Debtors' post-petition liquidity needs. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Agent and the DIP Lenders on terms more favorable than the terms of the DIP Facility. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both the continued use of Cash Collateral and additional financing under the DIP Facility in order to satisfy their post-petition liquidity needs.

22.    The DIP Agent and the DIP Lenders have indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the Interim Order and in the DIP Credit Documents. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that

the financing to be provided by the DIP Lenders pursuant to the terms of the Interim Order and

the DIP Credit Documents represents the best financing presently available to the Debtors.

   23.  Each of the First Lien Agent and the First Lien Lenders are prepared to

consent to: (i) the imposition of certain liens under section 364(d)(1) of the Bankruptcy Code in

favor of the DIP Agent, for the benefit of itself and the DIP Lenders, but solely on the terms and

conditions set forth in the Order and in the DIP Credit Documents, which liens will prime the

liens of the First Lien Lenders and the Second Lien Lenders (the "Primed Liens"), and (ii) the

Debtors' use of the Pre-Petition Collateral (including the Cash Collateral), provided that the

Court authorizes the Debtors, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, to

grant to the First Lien Agent, for the benefit of itself and the First Lien Lenders, the protections

set forth in the Interim Order, and to grant to the Second Lien Agent, for the benefit of itself and

the Second Lien Lenders, the protections set forth in the Interim Order and the *Interim Order (A)*

*Authorizing the Debtors to (I) Utilize Cash Collateral of Second Lien Lenders Pursuant to 11*

*U.S.C. § 363 and (II) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363; and*

*(B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* being submitted to the Court

concurrently herewith (the "Second Lien Adequate Protection Order").

   24.  Debtors have negotiated the DIP Credit Documents in good faith and at

arm's-length basis with the DIP Agent. Debtors believe that the terms of the loan facility

provided under the DIP Credit Documents are fair and reasonable, reflect the Debtors' exercise

of prudent business judgment consistent with their fiduciary duties, and are supported by

reasonably equivalent value and fair consideration.

## Summary Of Interim Order

25.    The following is a summary of the key terms of the DIP Credit Agreement and the Interim Order.[3] The key provisions of the Interim Order are summarized below:

    a.    Borrower and Guarantors:  Debtors.

    b.    Lender:  Goldman Sachs Specialty Lending Group, L.P. ("GSSLG") or an affiliate of GSSLG to be identified and/or other financial institutions selected by GSSLG.

    c.    Revolving Loan Amount:  $2.5 million initially and $9.0 million in total.

    d.    Term Loan Amount:  The entire amount of the rolled-up First Lien Obligations.

    e.    Interest Rate:  With respect to the DIP Revolving Facility, is a floating rate equal to Base Rate + 7.00%; with respect to the DIP Term Loan, a floating rate equal to Base Rate + 4.50%.

    f.    Fees:  A facility fee of $270,000; an administration fee of $100,000 per annum; and an unused line fee of .5% per annum

    g.    Term:  The DIP Loan shall be due and payable on the earliest to occur of: (i) one hundred eighty (180) days after the Petition Date, (ii) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 30-day period, (iii) the effective date of a plan of reorganization that is confirmed pursuant to an

---

[3]  To the extent there is any discrepancy between the summary herein (or the description of the Interim Order in this Motion) and the Interim Order or the DIP Credit Agreement, the terms of the Interim Order and DIP Credit Agreement shall govern.

order entered by the Bankruptcy Court in the Case, (iv) the acceleration of the DIP Loans and the

termination of the "Commitments" in accordance with the DIP Credit Agreement, (v) the entry

of an order by the Bankruptcy Court granting relief from the automatic stay permitting

foreclosure of any assets of the Debtors in excess of $100,000 in the aggregate, (vi) the date a

sale of all or substantially all of the capital stock or assets of any Debtor or any of their

respective subsidiaries is consummated under section 363 of the Bankruptcy Code, or (vii) the

entry of an order of dismissal or conversion of the Cases or the appointment of a Chapter 11

Trustee or a responsible officer or an examiner with enlarged powers relating to the operation of

the business of any Debtor.

        h.      <u>Acknowledgement of First Lien Obligations</u>: The Debtors

acknowledge and admit the amount of the First Lien Obligations and admit that the First Lien

Obligations are secured by valid, enforceable, duly perfected liens. However, any party in

interest with standing (other than the Debtors, but including any statutory committee) may file an

adversary proceeding or contested matter, no later than the date that is at least sixty days from

the formation of the Committee, challenging the validity, enforceability, extent or priority of the

First Lien Obligations or otherwise assert any claims or causes of action against the DIP Agent.

*See* Interim Order ¶¶ 5, 7.

        i.      <u>DIP Budget</u>: The Debtors are permitted to use Cash Collateral in

accordance with the DIP Budget, subject to certain specified variances. *See* Credit Agreement §

2.5.

j.      DIP Liens:  The DIP Agent is granted a first priority security

interest in and liens (the "DIP Liens") upon all present and after-acquired property of the Debtors

other than under chapter 5 of the Bankruptcy Code and the proceeds thereof ("Avoidance

Actions").  The DIP Liens shall prime the First Priority Liens and Second Priority Liens, but no

other valid, properly perfected and non-avoidable liens existing as of the Petition Date that were

senior to the liens securing the First Lien Obligations (generally defined as the "Non-Primed

Liens").  *See* Interim Order ¶ 23.

k.      Superpriority DIP Claims:  All DIP Obligations (including,

without limitation, all DIP Loans) shall constitute allowed superpriority administrative expense

claims (the "Superpriority Claims") with priority, subject to the Carve-Out, over any and all

administrative expenses, diminution claims, and all other claims against the debtors, now

existing or hereafter arising, of any kind whatsoever.  *Id.* at ¶ 28.

l.      Replacement Liens:  As adequate protection in respect of collateral

diminution, the First Lien Agent is granted adequate protection liens on the DIP Collateral (the

"Adequate Protection Liens").  The Adequate Protection Liens shall be junior in priority to the

DIP Liens, junior to the Non-Primed Liens with respect to the collateral encumbered by any such

Non-Primed Liens to the extent such Non-Primed Liens were senior to the liens of the Pre-

Petition Agent securing the Pre-Petition Obligations as of the Petition Date, and senior to any

other liens.  *Id.* at ¶ 30.

m.      Additional Adequate Protection:  As additional adequate

protection, (i) the First Lien Agent shall be entitled to the current cash payment (on a provisional

basis and subject to ultimate allowance under section 506(b) of the Bankruptcy Code) of the fees

and expenses of legal counsel and other professionals retained by the Pre-Petition Agent, in

accordance with the terms of the Pre-Petition Credit Agreement, and such legal counsel and

other professionals shall not be obligated to file interim or final fee applications with respect to

such fees and expenses; and (ii) except for the DIP Facility and the DIP Liens granted to the DIP

Agent and the DIP Lenders, the Debtors shall be prohibited from incurring additional

indebtedness equal to or senior in priority to the Pre-Petition Obligations. *Id* at ¶ 32.

        n.     <u>Professional Fee Carve-out</u>: The Replacement Liens and

Superpriority Claim shall be subject to a Carve-Out for professional fees incurred by the

Debtors, any statutory committee of unsecured creditors appointed in these cases and any

disbursement of any member of such committees in an aggregate amount not to exceed the

amounts set forth in the DIP Budget and, upon a "Triggering Event," not to exceed $250,000.

*See Id.* at ¶ 33.

        o.     <u>Surcharge Waiver</u>. The DIP Agent and First Lien Agent seek no

immediate waiver of any estate surcharge rights. The DIP Agent and First Lien Agent intend,

however, to seek such a waiver at the Final Hearing. *See Id.* at ¶ 35.

        p.     <u>Stay Relief</u>. The DIP Agent, DIP Lenders, First Lien Agent and

First Lien Lenders are given relief from the automatic stay following notice upon the occurrence

of a default. *See Id.* at ¶ 47.

q.    Events of Default.  The Events of Default under the DIP Credit

Agreement are as typical in debtor in possession financing, and are set forth at section 7.1 of the

DIP Credit Agreement.  Additional Events of Default include:

(1)    Failure of the Company to obtain within thirty (30) days after Petition Date an Acceptable Bidding Procedures Motion;

(2)    Failure of the Company to obtain within one hundred twenty (120) days after the Petition Date an "Acceptable Sale Order";

(3)    Failure of the Company to consummate the Approved Sale within fifteen (15) days after the entry of the Sale Approval Order in the Case;

(4)    The Company or any Guarantor makes any filing or otherwise supports a proposed plan of reorganization by the Company or any Guarantor that does not provide for the payment in full and in cash of obligations outstanding under the DIP Credit Facilities; and

(5)    Stephen V. Coffey shall, for any reason, cease to actively serve as CRO and a replacement CRO acceptable to Agent and Lenders is not promptly retained on terms acceptable to Agent and Lenders and the retention of such replacement promptly approved by the Bankruptcy Court.

**Basis for Relief**

**B.    The Relief Requested is Authorized by Section 363 of the Bankruptcy Code**

26.    The Debtors' use of property of their estates is governed by section 363 of

the Bankruptcy Code.  Section 363(c)(1) provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108. . . of this title and unless the court orders

> otherwise, the trustee may enter into transactions, including the
> sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of
> the estate in the ordinary course of business without notice or a
> hearing.

11 U.S.C. § 363(c)(1).[4]

      27.     The Debtors require interim financing to fund, among other things, the

Debtors' cash requirements for working capital and general corporate needs for the 30-day

period commencing on the date hereof. The Debtors are unable to obtain adequate unsecured

credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other

financing under section 364(c) or section 364(d) of the Bankruptcy Code on equal or more

favorable terms than those set forth in the DIP Credit Agreement and the other DIP Credit

Documents within the time frame required by their needs to avoid immediate and irreparable

harm. A loan facility in the amount and in the manner provided by the DIP Credit Agreement

and the other DIP Credit Documents is not available to the Debtors, generally, without granting

to the DIP Agent, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, the

benefits set forth in the DIP Credit Documents. After considering all alternatives, the Debtors

have concluded in the exercise of their prudent business judgment that the loan facility provided

under the DIP Credit Documents (as described below) represents the best working capital

financing available to them.

---

[4] A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate,
including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. *See* 11
U.S.C. § 1107(a).

### Basis for Relief Requested

## DIP Loan

### Legal Standard

28.    Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *see also 3 Collier on Bankruptcy* ¶364.03, at 364-7-18 (15th ed.).

29.    Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1)with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2)    secured by a lien on property of the estates that is not otherwise subject to a lien; or (3)  secured by a junior lien on property of the estates that is subject to a lien.

11. U.S.C. § 364(c).

30.    The Debtors satisfy the requirements of section 364(c) of the Bankruptcy Code because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates.

### The Debtors Were Unable to Obtain
### Credit on More Favorable Terms

31.     In satisfying the standards of section 364(c) of the Bankruptcy Code, a

debtor need not seek credit from every available source, but should make a reasonable effort to

seek other sources of credit available of the type set forth in sections 364(a) and (b) of the

Bankruptcy Code. *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee

had demonstrated by good faith effort that credit was not available without senior lien by

unsuccessfully contacting other financial institutions in immediate geographic area; "the statute

imposes no duty to seek credit from every possible lender before concluding that such credit is

unavailable"); *Ames Department Stores, Inc.*, 115 B.R. at 40 (finding that debtor demonstrated

the unavailability of unsecured financing where debtor approached several lending institutions).

32.     In order for the Debtors to achieve the necessary liquidity to administer

the Chapter 11 cases and accomplish an orderly liquidation of their assets, the Debtors must have

access to the DIP Loans. The Debtors have not been able to obtain post-petition financing on an

unsecured basis, pursuant to section 364(a) or 364(b) of the Bankruptcy Code. Similarly, the

Debtors have sought, but have been unable to obtain, post-petition financing under section

364(c) of the Bankruptcy Code in amounts sufficient to provide the Debtors with the necessary

liquidity, other than secured by liens under section 364 of the Bankruptcy Code such as those set

forth in the DIP Loan.

33.     As discussed above, the Debtors are unable to obtain financing from other

capital sources. No other lender or capital source will provide the Debtors with post-petition

financing on terms equal or more favorable to the estates than the proposed DIP Loan under the

circumstances.

### Protections Under Bankruptcy Code Section 364(e)

34.    The Debtors believe that the terms and conditions of the DIP Loan are the

best possible under the circumstances of these cases, and were negotiated in good faith and at

arms-length with all parties represented by experienced counsel.  Accordingly, the DIP Agent

should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code,

such that if any of the provisions of the DIP Loan are later modified, vacated, stayed or

terminated by subsequent order of this or any other Court, the DIP Agent will be fully protected

with respect to any amounts previously disbursed.

### Use of Cash Collateral

### Legal Standard

35.    The Debtors' use of property of the estates is governed by section 363 of

the Bankruptcy Code.  Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . .
> . of this title and unless the court orders otherwise, the trustee [or debtor-in-
> possession] may enter into transactions, including the sale or lease of property of
> the estates, in the ordinary course of business, without notice or hearing, and may
> use property of the estates in the ordinary course of business without notice or
> hearing.

11 U.S.C. § 363(c)(1).  The Bankruptcy Code establishes a special requirement, however,

regarding the debtor in possession's use of "cash collateral," defined as "cash, negotiable

instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever

acquired in which the estates and an entity other than the estates have an interest . . .." 11 U.S.C.

§ 363(a).  Section 363(c)(2) of the Bankruptcy Code permits the debtor in possession to use, sell

or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances

exist: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after

notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this

section.  11 U.S.C. § 363(c)(2).

36.     The First Lien Lenders here consent to the use of Cash Collateral on the

terms set forth in the Interim Order and this Motion.

**Interim Authorization**

37.     The authorization to obtain the DIP Loan and use Cash Collateral pending

a final hearing will preserve the value of the Debtors' business only if authorization is granted

immediately on short notice.

38.     Bankruptcy Rule 4001(c) and (b) specifically recognize that it might be

necessary to schedule hearings on requests for interim authorization to obtain postpetition

financing or use of cash collateral because of the business exigencies of individual cases.  *See*

*also*, 11 U.S.C. §102(1) (defining "after notice and a hearing" to mean after such notice and such

opportunity for a hearing as is appropriate in the particular circumstances of a given case).

39.     In this instance, the Debtors must have immediate use of the DIP Loan and

Cash Collateral in order to pay their remaining payroll and other expenses and preserve and

maximize the value of their assets.  Funds are urgently needed to meet all of the Debtors'

liquidity needs and to administer their chapter 11 cases in an orderly manner.  In the absence of

immediate post-petition financing, the Debtors' ability to preserve the value of their businesses

and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates and creditors.

40.    The Debtors seek authorization on an interim basis to utilize up to $2 million under the DIP Loan and use of Cash Collateral for the purposes set forth in the DIP Budget pending the Final Hearing.

41.    Based on the foregoing, the Debtors respectfully request that, pending a final hearing on this Motion, the terms and provisions of the DIP Loan and use of Cash Collateral be implemented and approved on an emergency interim basis, to the extent of authorizing the Debtors to obtain interim post-petition financing and use Cash Collateral as provided for in the DIP Credit Agreement and Interim Order.

42.    As, the Debtors submit, is apparent from the foregoing, the interim relief requested in this Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors.

### Deviations from Delaware Local Bankruptcy Rule 4001-2

43.    Delaware Local Bankruptcy Rule 4001-2 requires a debtor in possession to affirmatively advise the Court of any deviations from certain proscribed provisions to be included in interim and final Orders.  The Interim Order includes the following such provisions:

a.    Surcharge Prohibition.  The DIP Agent and Pre-Petition Lenders propose that the Final Order prohibit any surcharge on the collateral of the DIP Agent or the First Lien Lenders pursuant to section 506(c) of the Bankruptcy Code.

b.    Roll Up. The DIP Agent and Pre-Petition Lenders propose that the

Final Order approve a complete roll-up of the First Lien Obligations.

### Interim Approval Should Be Granted

44.    Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion

to use cash collateral pursuant to section 363 of the Bankruptcy Code and to obtain credit

pursuant to section 364 of the Bankruptcy Code not be commenced earlier than fifteen (15) days

after the service of such motion. Upon request, however, the Court is empowered to conduct a

preliminary expedited hearing on the motion and authorize the use of cash collateral and the

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the

Debtors' estates.

45.    Debtors request that the Court conduct an expedited preliminary hearing

on the Motion and authorize Debtors from and after the entry of the Interim Order until the Final

Hearing to utilize the cash collateral and borrow fund as provided in the Interim Order. This will

enable the Debtors to maintain ongoing operations and avoid immediate and irreparable harm

and prejudice to the estates and all parties in interest pending finalization of the debtor in

possession financing documents.

### Notice

### A.    Notice With Respect to Emergency Interim Financing Request

46.    Notice of this Motion has been given to the following parties or, in lieu

thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors'

Pre-Petition and postpetition lenders or their counsel; and (iii) the holders of the consolidated

thirty-five largest unsecured claims against the Debtors.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Rule 9013-1(m) of the *Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "Delaware Local Bankruptcy Rules").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**B.      Notice With Respect to Final Interim Orders**

47.      Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors' Pre-Petition and postpetition lenders or their counsel; and (iii) the holders of the thirty-five largest unsecured claims against each of the Debtors.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Delaware Local Bankruptcy Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

48.      No previous application for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request: (i) entry of the Interim Order attached to this Motion, approving the DIP Loan and authority to use the DIP Agent's Cash Collateral on an interim basis pending the Final Hearing; (ii) scheduling the Final Hearing on this Motion for approval of the DIP Loan and use of Cash Collateral on a final basis; (iii) final approval of the DIP Loan and use of Cash Collateral following the Final Hearing; and (iv) such further relief as is just and proper.

Dated: December 9, 2008

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Brad R. Godshall (Cal. Bar No. 105438)
David Bertenthal (Cal. Bar No. 167624)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
E-mail:  ljones@pszjlaw.com

[Proposed] Counsel for the Debtors
and Debtors In Possession