IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | Case No. 08-13256 (CSS) |
| | : | |
| EZ LUBE, LLC, *et al*. | : | (Jointly Administered) |
| | : | |
| | : | |
| Debtors. | : | **Objection deadline: December 30, 2008 at 4:00 pm** |
| | | **Hearing Date:  January 5, 2009 at 3:30 pm ET** |
| | | Re:  Docket Nos. 10, 17 |

**COMBINED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTIONS FOR FINAL ORDERS AUTHORIZING (A) SENIOR DEBTOR-IN-POSSESSION FINANCING AND (B) USE OF CASH COLLATERAL OF SECOND LIEN LENDERS**

The Official Committee of Unsecured Creditors (the "Committee") of EZ Lube, LLC, and Xpress Lube-Tech, Inc. (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby objects to the Debtors' (A) Motion to Approve Final Order (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, and (III) Granting Adequate Protection to Pre-Petition First Lien Lenders (the "DIP Motion"); and (B) Motion for Authorization to (I) Utilize Cash Collateral of Second Lien Lenders and (II) Provide Adequate Protection (the "Cash Collateral Motion," and together with the DIP Motion, the "Financing Motions"), and states in support of its objection as follows:

**PRELIMINARY STATEMENT**

1. The Financing Motions are designed to dictate the ultimate outcome of this case—a swift foreclosure sale of the Debtors' entire business—but with none of the protections of the plan process, with no showing or determination that a sale is in the best interests of the estate, and with no participation—or recovery—by the unsecured creditor body.

#10389506 v4

2.      The Financing Motions aim to accomplish this by mandating a sale of substantially all of the Debtors' assets and by pronouncing it an event of default if the Debtors fail to achieve any of the DIP-imposed deadlines and conditions for such sale. For the relatively paltry sum of $9 million in new financing (an amount calculated solely to pay Chapter 11 expenses and maintain going concern value for the benefit of the purchaser), the Debtors have sold away their right to reorganize or to pursue any alternative sale strategies.

3.      Moreover, for only $9 million, the Debtors have sold away their right (and very shortly, anyone else's right) to challenge the claims and liens asserted by their First Lien Lenders[1] and Second Lien Lenders (together, the "Lenders")—despite the fact that those claims and liens were procured in a December 2005 leveraged buy-out that may constitute a fraudulent transfer within the meaning (and the limitations period) of the California Uniform Fraudulent Transfer Act, Cal Civ Code § 3439 *et seq.* (2008).

4.      The cost of the proposed financing is too high—both in dollars and in substantive rights—and it will be paid for entirely by the unsecured creditors. There cannot possibly be a reorganization in this case if the Lenders have their way. They will have taken everything—the sale proceeds will go to the First Lien Lenders, the company itself to the Second Lien Lenders—leaving the administrative and unsecured creditors with nothing but a Chapter 7 conversion order.

5.      The financing sought here has no valid Chapter 11 purpose, and the Court should refuse to approve it.

---

[1] Unless otherwise stated, capitalized words used herein have the meanings ascribed to them in the Financing Motions.

**PROCEDURAL BACKGROUND**

6.      The Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code on December 9, 2008 (the "Petition Date").

7.      On December 22, 2008, following an organizational meeting conducted on December 19, 2008, the United States Trustee filed a Notice of Appointment of Committee of Unsecured Creditors.[2]

8.      According to the Debtors, they owe their general unsecured creditors approximately $11 million, of which approximately $9 million is trade debt.

**THE 2005 ACQUISITION**

9.      In December 2005, the predecessor of EZ Lube, LLC, was acquired through a merger (the "Merger") whereby the Debtors' founders sold 75% of their equity to a new entity.

10.     In connection with the Merger, the Debtors borrowed the sum of approximately $91 million,[3] in a package that included a first-lien term loan, a revolver, a second-lien term loan and unsecured notes. To secure the first-lien term loan and revolver, the Debtors purported to grant a blanket lien on all their assets to Goldman Sachs Specialty Lending Group, L.P., as administrative agent, collateral agent, lead arranger, syndication agent and document agent for itself and certain other lenders (the "First Lien Lenders"). To secure the second-lien term loan, the Debtors purported to grant a blanket lien on all their assets to GSO Capital Partners LP ("GSO"), as administrative agent, collateral agent, lead arranger, syndication agent, and documentation agent, and certain other lenders (the "Second Lien Lenders," and together with the First Lien Lenders, the "Lenders").

---

[2]     The members of the Committee are: (i) Camden Holdings, LLC; (ii) ExxonMobil Oil Corporation; (iii) Filpac, Inc.; (iv) A&S Engineering; (v) ADX, Inc.; (vi) Miller & Co, Inc.; and (vii) Mailmark Direct.

[3]     The Committee does not yet have any information regarding where the $91 million went.

11.     As of December 31, 2007, the Debtors reportedly had total assets of $113 million and total liabilities of $114 million.

## ARGUMENT

**A.     INTRODUCTION**

12.     Although the Debtors allege that the terms of their proposed financing orders were negotiated in good faith, their Lenders were obviously positioned to dictate terms, and the proposed financing does not reflect terms negotiated in any form of open market. *See In re The Colod Group, Inc.*, 324 B.R. 208, 219 (Bankr.W.D.N.Y. 2005).

13.     However, "[t]he debtor and its secured creditor do not constitute a legislature.  Thus, they have no right to implement a private agreement that effectively changes the bankruptcy law with regard to the statutory rights of third parties." *Colod*, at 224.  The proposed financing in this case would effectively alter significant rights of the unsecured creditors.

14.     Post-petition financing will not be approved where it is apparent that the purpose of the financing is to benefit the lender-creditor rather than the estate as a whole. *In re Ames Department Stores, Inc.,* 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990).  Courts must balance the needs of the debtor against the rights and expectations of its creditors, by focusing on those suspect proposed financing terms that would:

> a.     tilt the conduct of the bankruptcy case,
>
> b.     prejudice, at an early stage, the rights that the Bankruptcy Code confers for the benefit of all creditors, and
>
> c.     leverage the chapter 11 process by preventing motions by parties-in-interest from being decided on their merit.

*Ames*, at 37, *citing In re Tenney Village Co.*, 104 B.R. 562, 567-70 (Bankr. D.N.H. 1989).

> Under the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank,

      seize control of the reins of reorganization, and steal a march on
      other creditors ….

*Tenney Village*, 104 B.R. at 568.

      15.      The proposed financing here would clearly tilt the conduct of the case, by preordaining a rapid liquidation; it would disarm the Debtors and other parties-in-interest of the weapons otherwise available to them under the Code; it would prejudice the rights of other parties with respect to their own claims as well as any claims they might have against the Lenders; and it would allow the Lenders to seize control of the reins of these cases.

      16.      Enumerated below are the specific grounds on which the Financing Motions must be denied.

B.      **<u>THE DIP WILL FORCE A LIQUIDATION OF THE DEBTORS</u>.**

      17.      Through the proposed DIP Credit Agreement, the First Lien Lenders would control the course of these cases, steering them to a swift sale that would pay off the First Lien Lenders' claims in full, without regard to whether a sale is in the bests interests of the estate and without regard to whether a sale would result in any recovery for unsecured creditors. And it would accomplish this result without undergoing any of the scrutiny or rigors of the plan confirmation process.

      18.      The DIP is thus a *de facto* plan of liquidation. The following terms guarantee the Lenders' chosen outcome:

      a.      The Debtors are in default unless they obtain an Acceptable Bidding Procedures Order within 30 days after the Petition Date. (DIP Credit Agreement, ¶ 7.1(f)(vii)).

      b.      The Debtors are in default unless they obtain an Acceptable Sale Order within 120 days after the Petition Date. (DIP Credit Agreement, ¶ 7.1(f)(viii)).

      c.      The Debtors are in default unless they consummate an Approved Sale within 15 days after entry of the Acceptable Sale Order. (DIP Credit Agreement, ¶ 7.1(f)(ix)).

     d. The Debtors are in default if the proposed Asset Purchase Agreement with their Second Lien Lenders is terminated for any reason, unless the Debtors enter into an acceptable alternative transaction for the sale of substantially all of their assets. (DIP Credit Agreement, ¶ 7.1(f)(iv)).

   19. A sale of the Debtors' assets on the timetable demanded by the Lenders, in the current economic climate, is doomed to generate less than their maximum value. In such a short time period, it will be virtually impossible to find a disinterested buyer with access to adequate financing that is willing to pay a fair price. The result will be a sale by default to the Second Lien Lenders, at a price far below what was paid for the business in the 2005 LBO—the same transaction that purportedly gave the Lenders the right to dictate this outcome.

   20. It is premature this early in a case to foreclose any outcome other than a swift sale at an amount sufficient only to pay off the First Lien Lenders, yet these terms guarantee that the Debtors will have no other option. The Debtors have completely forfeited their duty to exercise their independent business judgment whether to sell or reorganize. .

   21. The DIP Loan would give the Lenders "the ultimate say over the very goal" of these cases, a confirmed plan. *In re Tenney Village Company, Inc*., 104 B.R. at 568. Worse yet, the plan the Lenders have ordained here is not a plan of reorganization, but rather of liquidation, and for an amount that is guaranteed to satisfy the Lenders alone.

   22. "The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *In re Seth Co., Inc*., 281 B.R. 150, 153 (Bankr. D.Conn. 2002). The Lenders' liquidation mandate would strip every other constituency of its statutory rights to vote on a plan.

   23. For these reasons, the Committee objects to those provisions of the Financing Order and the DIP Loan that would require the Debtors to sell their assets, and the timing of such a sale, if ordered. These provisions absolutely predetermine the outcome of this

case and leave no room for exploring alternative scenarios for the reorganization of these Debtors. Moreover, these provisions needlessly accelerate the sale process and create a "fire sale" atmosphere that is unlikely to result in maximization of the value of the Debtors' assets.

**C.   THE ROLL-UP OF THE PRE-PETITION DEBT IS AN IMPERMISSIBLE PREFERENCE**

24.   The economic reality of the proposed DIP Loan is that it is a $9 million loan disguised as a $62.5 million loan. Out of the supposed $62.5 million borrowing, $53.5 million will be immediately paid to the First Lien Lenders on the roll-up of their pre-petition debts, leaving a balance of only $9 million. Moreover, according to the DIP budget, another $2.8 million will be paid to the First Lien Lenders in fees and interest, and another $4.3 million in Chapter 11 expenses. This means that of the supposed $62.5 million DIP Loan, less than $2 million will actually be available to the Debtors for their operating expenses.

25.   The Committee does not object to a loan facility designed to meet the Debtors' legitimate working capital needs, but borrowing $53.5 million to pay pre-petition debts does not contribute to working capital. There is no Chapter 11 purpose to be served by such borrowing.

26.   Yet in exchange for this small advance, the First Lien Lenders seek to extract vast concessions from the Debtors and its creditors and to bullet-proof their own positions. By rolling up their pre-petition claims into the DIP Loan, the First Lien Lenders are gaining the benefit of an otherwise impermissible cross-collateralization to improperly prefer or "white wash" their prepetition security interests. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 574 (3d Cir. 2003). Both roll-up and cross-collateralization provisions have the same effect of improving the priority of a prepetition creditor. *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta*

*Co.*, 322 B.R. 560, 569 (M.D. Pa. 2005). By paying off pre-petition liabilities with post-petition borrowings, the First Lien Lenders may succeed in satisfying an undersecured pre-petition loan with post-petition collateral. Worse, they may succeed in immunizing their pre-petition liens from avoidance as fraudulent transfers in connection with the LBO. The proposed roll-up would effectively convert their vulnerable pre-petition liens into sacrosanct post-petition liens—a "whitewash" indeed.

27. The Committee objects to the grant of any liens on post-petition collateral to secure pre-petition debt. There is no justification for so elevating the status of pre-petition claims, when the First Lien Lenders have expressly consented to the filing of these Chapter 11 cases to accomplish a sale that has no value to the unsecured creditors.

28. The First Lien Lenders will not be unfairly prejudiced by excluding the roll-up from the DIP Loan. To the extent their pre-petition debts are oversecured, they will be paid in full, with post-petition interest and attorneys' fees under 11 U.S.C. § 506(b). To the extent they are undersecured, the repayment of the full amount of the pre-petition debt is prohibited under the Code. And to the extent they are invalid or avoidable, the Code prohibits any payment at all.

**D.    THE DEBTORS' WAIVERS AND RELEASES SHOULD NOT BIND OTHER PARTIES-IN INTEREST.**

29. In the Financing Motions, the Debtors have made myriad waivers, releases and acknowledgments with respect to the pre-petition claims and liens asserted by their Lenders. Specifically, the Debtors admit that the liens are legal, valid, binding, perfected, not subject to defense, counterclaim, surcharge, offset, subordination or otherwise avoidable.

30. These potential claims and defenses are property of the estate that can be abandoned only upon a finding that they are of inconsequential value to the estate. 11 U.S.C. § 554(b). Yet not only have the Debtors waived these claims and defenses, they seek to bind the

-8-

Committee to the same admission, unless, or by February 17, 2009, the Committee obtains an order granting it standing to pursue claims on behalf of the estates, and files a proceeding challenging the Lenders' positions.

31. The Committee objects to the provision of a mere 60-day period in which to (a) investigate the pre-petition liens and claims, (b) analyze whether they are valid, (c) file a motion seeking standing to challenge the liens and claims, (d) obtain an order granting standing, and (e) file a complaint or other proceeding against the Lenders. Sixty days is clearly inadequate for such tasks, particularly since the same 60-day period coincides with the period during which the Debtors' sale process will be underway, when the Committee must necessarily be focused on the valuation of assets, the marketing efforts and the auction procedures, or on developing alternative strategies for the reorganization of these companies. The Committee should not be required to expend its limited resources in investigating the Lenders' claims at the same time.

32. The requirement that the Committee first seek standing to prosecute any claims on behalf of the estate is unnecessary and designed only for delay. While a motion for derivative standing should of course be required when a committee contends that a debtor has failed or refused to pursue a cause of action and the committee wishes to act in the debtor's stead, in this case there is no question that the Debtors will not and cannot pursue these claim on their own. Unless derivative standing is granted, the estates' property will unavoidably be forfeited.

33. The Committee therefore objects to any provision binding it or any other party to the Debtors' waivers, releases and acknowledgements before the expiration of at least 120 days. In addition, the Committee submits that the Final Orders entered on the Financing Motions should affirmatively provide that the Committee has standing to challenge the validity,

enforceability, priority or extent of the prepetition indebtedness and liens, and to bring any other claim or action against the Lenders that the Debtors have waived or released.

E. **THE FINAL ORDERS SHOULD PRESERVE THE RIGHT OF SURCHARGE FOR THE BENEFIT OF THE ESTATE.**

34. Section 506(c) of the Bankruptcy Code allows the debtor or trustee to surcharge the Lenders' collateral for the reasonable and necessary costs of preserving and disposing of such collateral. The Third Circuit explained the policy behind this provision as follows:

> Congress' intent in enacting § 506(c) was to assure that when a claimant "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral, the . . . debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party." 124 Cong. Rec. 32,398 (cum. ed. Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S. Code Cong. & Admin. News 6451. Thus, . . . 506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant.

*Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995).

35. Thus, "when a secured creditor agrees to the continued operation of a business for the purpose of increasing the ultimate gain in the event of a reorganization or liquidation, the necessary administrative expenses, including taxes, incurred during the continued operation directly benefitted the creditor and were thus recoverable under Section 506(c)." *U.S. v. Boatmen's First National Bank of Kansas City*, 5 F.3d 1157, 1160 (8th Cir. 1993) *overruled on other grounds by In re Hen House Interstate, Inc.*, 177 F.3d 719 (8th Cir. 1999), *aff'd Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000). *See also Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.),* 799 F.2d 91, 94-95 (3d Cir. 1986)

-10-

(secured creditor required to pay for postpetition utility service where such service permitted continued operations and resulted in a higher sale price).

36. A case that is being run for the sole benefit of the lenders, as these cases clearly are, cries out for the application of section 506(c), and a waiver of such claims is totally inappropriate. *See Colod*, 324 B.R. at 224. If the Lenders had foreclosed on their collateral outside bankruptcy, they could not have avoided paying all the costs associated with the foreclosure. Instead, in order to maintain the going-concern value of the Debtors' assets and thereby enhance their own recovery, the Lenders chose to avail themselves of the Chapter 11 process.

37. Under such circumstances, not only should section 506(c) rights be preserved for the benefit of the estate, but the Lenders should be expressly required to pay all administrative costs arising from their use of Chapter 11 to maintain and dispose of their collateral.

**F.   THE FINAL ORDERS SHOULD PRESERVE THE ESTATES' RIGHTS UNDER SECTION 551.**

38. Pursuant to section 551 of the Bankruptcy Code, transfers and liens that are avoided are automatically preserved for the benefit of the estate. This preservation ensures that the avoidance of a senior lien benefits the entire estate and not just a party with a junior lien. Moreover, there is benefit to the estate even if there are liens senior to the one that has been avoided, because state law recognizes the right of a junior lien creditor to invoke the doctrine of marshalling, *see In re John I. Paulding, Inc*., 76 B.R. 7, 8 (Bankr. D. Mass. 1987), a right that section 551 preserves for the estate. The proposed financing, however, would strip that right away.

39. In these cases, there is a realistic possibility that some or all of the pre-petition liens may be avoided as fraudulent transfers in connection with the 2005 LBO. Whether it

is the senior or junior lien that is avoided, the estates would benefit from the avoidance under section 551. There is no justification for depriving the estates of that value.

**G.  THE LENDERS' FEES AND EXPENSES SHOULD BE PAYABLE ONLY IF REASONABLE AND AFTER REVIEW BY THE COMMITTEE AND THE UNITED STATES TRUSTEE.**

40. The proposed financing would require the Debtors to pay "adequate protection payments" to the First Lien Lenders, in the form of "reasonable fees, expenses and disbursements … of any law firm, counselor or other professional advisor." *See* Interim DIP Order, ¶ 42(a). Such fees and expenses must be paid on a current basis without the necessity of filing any application with or obtaining further order from the Court. *See* DIP Motion, ¶ 25(m).

41. Although only "reasonable" costs and expenses are to be paid, there is no procedure in place for any party, including the Debtor, to review the reasonableness of the expenses.[4] The limitation to "reasonable" costs and expenses is thus entirely illusory.

42. The Committee and the U.S. Trustee should be afforded the opportunity to review the fees and expenses of the First Lien Lenders, and if either objects on the ground that such fees and expenses were not reasonable, the Debtors should be authorized to pay such amounts only upon court approval.

**H.  THE CARVE-OUT AND THE COMMITTEE BUDGET ARE INADEQUATE.**

43. The proposed financing provides for a Carve-Out for professional fees incurred by the Debtors and the Committee in an amount not to exceed the aggregate set forth in the DIP budget, and after a "Triggering Event," not to exceed $250,000 total.

---

[4] Compare to the Expense Reimbursement payable to the Second Lien Lenders, which requires copies of invoices to be provided to the Debtors, the Committee and the Office of the United States Trustee and subject to a 10-day review and objection period.

44. The budgeted amounts for the Committee's professionals are inadequate and so low as to thwart the Committee's ability to provide the only real oversight in these cases. The amount allotted for the Committee is only a fraction of the amount allocated for the Debtors' and the Lenders' professionals. According to the proposed DIP budget, the Debtors' professionals will receive more receive more than $3.6 million in fees through June 5, 2009, on top of retainers already paid of almost $900,000.[5] In addition, the First Lien Lenders will be reimbursed for professional fees of $650,000, and the Second Lien Lenders will receive another $100,000. Meanwhile, the budgeted fees of the Committees' professionals (both attorneys and financial advisors) are only $380,000—as compared to $5,250,000 for the Debtors' and Lenders' professionals. The Committee budget is clearly adequate.

45. To further tie the Committee's hands, the proposed Final Orders prohibit it from spending more than $50,000 in investigating the pre-petition claims and liens, and from spending anything at all in challenging such claims and liens. The obvious design of these provisions is to prevent the Committee from conducting any real investigation. Yet the Lenders chose Chapter 11 as the vehicle for liquidating their collateral, and part of the Chapter 11 process is the formation of a statutory committee and a review of the pre-petition liens. Particularly where the DIP financing accrues entirely to the Lenders' benefit, as here, an unfettered review is called for.

46. Finally, the total Carve-Out of $250,000 following a Triggering Event is completely inadequate. A Triggering Event can occur any time there is an Event of Default and the Lenders elect to terminate the DIP. As discussed above, the DIP Credit Agreement contains

---

[5] The retainers are disclosed in the Debtors' Initial Monthly Operating Report filed December ___, 2008 (Docket # ___).

#10389506 v4

numerous events of default, including the failure to meet artificial deadlines calculated solely to accomplish a swift sale. If any of those deadlines is missed, the case professionals will have no more than $250,000 available to pay all of their fees plus the statutory fees to the Office of the United States Trustee.

## I. THE LENDERS MUST NOT BE GRANTED THE IMMEDIATE RIGHT TO STAY RELIEF AND TERMINATION OF CASH COLLATERAL.

47. Upon an event of default under the DIP Credit Agreement, the First Lien Lenders will have the right to terminate the facility upon three business days' advance written notice. *See* Interim DIP Order, ¶ 48. The three-day period (the "Notice Period") is obviously designed to afford an opportunity for other parties to independently determine whether a default has occurred. But that opportunity is meaningless in light of the right granted to the Lenders, *during the Notice Period*, to (a) terminate the Debtors' use of cash collateral and to (b) have immediate relief from the automatic stay to enforce their liens and security interests.

48. The Committee objects to granting the Lenders the immediate right, without first providing any notice or opportunity to cure, to unilaterally terminate the Debtors' right to use cash collateral and to enforce their liens and rights. Such a hair-trigger provision effectively eviscerates the three-day notice provision otherwise required for actions after default. The Lenders would effectively drive the Debtors out of business if they shut down the use of cash collateral or otherwise take action to seize their collateral.

49. The Committee and/or other parties in interest must be afforded notice and sufficient time to seek appropriate relief before the Lenders have the right to deliver such a death blow.

## CONCLUSION

WHEREFORE, the Official Committee of Unsecured Creditors of EZ Lube, LLC, LLC, *et al*., respectfully requests that this Court enter an Order denying the Financing Motions, or in the alternative, modifying the financing provisions as detailed above, and granting such other relief as is just and appropriate.

Dated: December 30, 2008

> THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF EZ LUBE, LLC, *et al.*
>
> /s/ James C. Carignan
> James C. Carignan (DE No. 4230)
> **PEPPER HAMILTON LLP**
> Hercules Plaza, Suite 5100
> 1313 Market Street
> P.O. Box 1709
> Wilmington, DE  19899-1709
> Wilmington, Delaware 19801
> (302) 777-6500
>
> and
>
> Francis J. Lawall
> **PEPPER HAMILTON LLP**
> 3000 Two Logan Square
> Eighteenth and Arch Streets
> Philadelphia, PA  19103-2799
> (215) 981-4000
>
> Proposed Counsel for the Official Committee of Unsecured Creditors

#10389506 v4