# BLACKLINE

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EZ LUBE, LLC, <u>et al.</u>,[1] | ) | Case No. 08-13256 (CSS) |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

---

## DISCLOSURE STATEMENT IN RESPECT OF PLAN OF REORGANIZATION OF EZ LUBE, LLC, ET AL., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

## IMPORTANT DATES

- Date by which Ballots must be received:  October 23, 2009 at 7:00 p.m. Eastern Time
- Date by which objections to Confirmation of the Plan must be filed and served:  October 23, 2009 at 4:00 p.m. Eastern Time
- Hearing on Confirmation of the Plan:  October 30, 2009 at 10:00 a.m.


Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Curtis A. Hehn (Bar No. 4264)
Timothy P. Cairns (Bar No. 4228)

Pachulski Stang Ziehl & Jones  LLP

Dated: September ——,25, 2009

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are EZ Lube, LLC (6472) and Xpress Lube-Tech, Inc. (3770).  The address for both Debtors is 3540 Howard Way, Suite 200, Costa Mesa, CA  92626.

Table of Contents

|  |  | **Page** |
|---|---|---|
| I. PREFATORY STATEMENT AND DEFINITIONS |  | 1 |
| II. INTRODUCTION AND OVERVIEW |  | 1 |
| A. | Introduction | 1 |
| B. | Disclaimers | 2 |
| C. | An Overview of the Chapter 11 Process | 3 |
| D. | Plan Overview | 4 |
| 1. | Summary of Classification and Treatment of Claims and Interests under the Plan | 5 |
| 2. | Exhibits to the Disclosure Statement | 10 |
| E. | Voting on the Plan | 11 |
| 1. | Who May Vote | 11 |
| 2. | How to Vote | 11 |
| F. | Confirmation of the Plan | 12 |
| 1. | Generally | 12 |
| 2. | Objections to Confirmation | 12 |
| 3. | Hearing on Confirmation | 13 |
| III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTOR |  | 14 |
| A. | Overview of the Debtor and its Operations | 14 |
| 1. | Overview of the Debtors | 14 |
| 2. | Business Growth & Operations | 14 |
| 3. | The Debtors' Equity Structure and Management | 15 |
| 4. | Prepetition Financing and Significant Indebtedness | 15 |
| 5. | Circumstances Leading to the Commencement of the Chapter 11 Cases | 17 |

| | B. | The Commencement of the Chapter 11 Cases | 18 |
|---|---|---|---|
| IV. First Day Motions and Other Relief | | | 19 |
| | A. | Employees | 19 |
| | B. | Cash Management | 20 |
| | C. | Taxes | 20 |
| | D. | Utilities | 20 |
| | E. | Interim Compensation for Professionals | 21 |
| | F. | Rejection of Certain Unexpired Leases of Nonresidential Real Property | 21 |
| | G. | Continuation of Customer Practices and Programs | 21 |
| | H. | Retention of Key Professionals | 22 |
| | I. | Ordinary Course Professionals | 22 |
| | J. | Postpetition DIP Financing and Consensual Use of First Lien Lenders Cash Collateral | 22 |
| | K. | Consensual Use of Second Lien Lenders' Cash Collateral | 23 |
| | L. | Bid Procedures and Sale | 23 |
| | M. | Appointment of the Creditors' Committee | 24 |
| | N. | Bar Date for Filing Proofs of Claim | 24 |
| | O. | Filing of Statements and Schedules and Meeting of Creditors | 25 |
| | P. | Other Material Postpetition Activities | 25 |
| | 1. | Rejection Of Certain Executory Contracts | 25 |
| | 2. | Extension of Deadline to Assume or Reject Unexpired Leases of Non-Residential Real Property | 25 |
| | 3. | Assumption of Unexpired Leases of Non-Residential Real Property | 26 |
| | 4. | The Standing Motion | 26 |

|  |  |  |  |
|---|---|---|---|
| 5. | Extension of Postpetition DIP Financing |  | 26 |

V. DESCRIPTION OF THE PLAN — 27

VI. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES AND PRIORITY TAX CLAIMS — 27

| A. | Administrative Claims | 27 |
|---|---|---|
| B. | Professional Fees | 28 |
| C. | Priority Tax Claims | 29 |

VII. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS — 29

| A. | Summary |  | 29 |
|---|---|---|---|
| B. | Classification and Treatment of Claims against the Debtor |  | 29 |
|  | 1. | Class 1: | 30 |
|  | 2. | Class 2: | 3031 |
|  | 3. | Class 3: | 3233 |
|  | 4. | Class 4: | 33 |
|  | 5. | Class 5: | 3334 |
|  | 6. | Class 6 | 34 |
|  | 7. | Class 7 – Interests: | 3839 |

VIII. ACCEPTANCE OR REJECTION OF THE PLAN — 39

| A. | Voting Classes | 39 |
|---|---|---|
| B. | Acceptance by Impaired Classes | 39 |
| C. | Presumed Acceptance/Rejection of Plan | 3940 |
| D. | Nonconsensual Confirmation | 3940 |
| E. | How to Vote | 3940 |

IX. MEANS FOR IMPLEMENTATION OF THE PLAN, GOVERNANCE OF REORGANIZED EZ LUBE, PROCEDURES FOR RESOLUTION

OF DISPUTED CLAIMS AND CASH DISTRIBUTIONS TO THE HOLDERS OF ALLOWED
CLASS 1, 2 AND 6 CLAIMS, AND THE PAYMENT
OF U.S. TRUSTEE FEES .......................................................................... 40̶41

A.    Exit Facilities .......................................................................... 40̶41

B.    Conversion of Debt to Equity and the Issuance of Units .......................................................................... 40̶41

    1.    Preferred Units .......................................................................... 41

    2.    Common Units .......................................................................... 41̶42

    3.    Management Units .......................................................................... 41̶42

C.    Establishment of the Plan Trust / Preservation and Transfer of Claims .......................................................................... 41̶42

D.    Merger of Xpress Lube. .......................................................................... 43̶44

E.    Governance of the Reorganized EZ Lube .......................................................................... 43̶44

    1.    Governance of Reorganized EZ Lube Generally. .......................................................................... 43̶44

    2.    Board of Managers. .......................................................................... 43̶44

    3.    Board Mechanics. .......................................................................... 43̶44

    4.    Preferred Member Approval Rights. .......................................................................... 44̶45

    5.    Future Distributions After the Effective Date. .......................................................................... 47

    6.    Redemption. .......................................................................... 48̶49

    7.    Certain Other Rights. .......................................................................... 49̶50

    8.    **Information Rights**. .......................................................................... 50̶51

    9.    Employment Agreements. .......................................................................... 51̶52

    10.    D&O Insurance. .......................................................................... 52

    11.    Provision of Services by and Other Opportunities. .......................................................................... 52

F.    Substantive Consolidation. .......................................................................... 52̶53

G.    Cancellation of Intercompany Claims. .......................................................................... 52̶53

H.    Continued Corporate Existence and Vesting of Assets. .......................................................................... 53

I.      Amendments to Articles of Organization/Certificates of Incorporation.      5354

J.      Claims Allowance Process                                                    5354

K.      Distributions.                                                              5455

L.      De Minimis Distributions.                                                   5556

M.      United States Trustee Fees.                                                 5556

N.      Effectuating Documents; Further Transactions.                               5556

X. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES                            56

A.      Executory Contracts and Unexpired Leases                                    56

    1.      Rejection of Certain Executory Contracts                                5657

    2.      Executory Contracts Assumed if Not Rejected                             5657

    3.      Bar Date for Rejection Claims.                                          5758

B.      Cancellation of Securities, Instruments, and Any Other
        Agreements Evidencing Claims and Interests.                                 58

XI. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN
    AND TO THE EFFECTIVE DATE                                                       5859

A.      Conditions to Confirmation of the Plan.                                     5859

B.      10.2 Waiver of Conditions.                                                  59

C.      Effect of Failure of Conditions to Confirmation.                           59

XII. EFFECTS OF CONFIRMATION                                                        5960

A.      Binding Effect of Plan                                                      5960

B.      No Interference                                                             5960

C.      Vesting of Estate Property in Reorganized EZ Lube Free and Clear            5960

D.      Releases of the Debtors, their Estates, and the Committee                   60

E.      Other Releases                                                              6061

F.      Injunction                                                                  6162

G.      Scope and Effect of Discharge                                               6162

| | | | |
|---|---|---|---|
| H. | Limitation of Liability | | 62 |
| I. | Survival of Indemnification Obligations | | 6263 |
| XIII. RETENTION OF JURISDICTION | | | 6263 |
| A. | Claims and Actions | | 6263 |
| B. | Specific Jurisdiction | | 6263 |
| C. | Failure of Bankruptcy Court to Exercise Jurisdiction | | 6465 |
| XIV. MISCELLANEOUS | | | 6465 |
| A. | Amendments. | | 6465 |
| B. | Certain Actions. | | 6465 |
| C. | Dissolution of Creditors' Committee. | | 65 |
| D. | Compliance with Tax Requirements. | | 6566 |
| E. | Governing Law. | | 6566 |
| F. | Construction. | | 6566 |
| G. | Defects, Omissions and Amendments. | | 6566 |
| H. | Filing of Additional Documents. | | 6667 |
| I. | Exhibits. | | 6667 |
| J. | Further Actions. | | 6667 |
| K. | Implementation. | | 6667 |
| L. | No Waiver of Discharge. | | 6667 |
| M. | Notices. | | 6768 |
| N. | Plan Interest Rate. | | 6769 |
| O. | Post-Confirmation Effect of Evidences of Claims or Interests. | | 6769 |
| P. | Record Date. | | 6869 |
| Q. | Registration Rights. | | 6869 |
| R. | Reservation of Rights. | | 6869 |

S.      Revocation and Withdrawal of the Plan.                          68̶70

T.      Section 1145 Exemption.                                         69̶70

U.      Setoffs and Recoupment.                                         69̶70

V.      Severability of Plan Provisions.                                69̶70

W.      Substantial Consummation.                                       69̶71

X.      Successors and Assigns.                                         70̶71

Y.      Tax Exemption.                                                  70̶71

Z.      Term of Injunctions or Stays.                                   70̶71

AA.     Time.                                                           70̶71

BB.     Waiver of Ten (10) Day Stay.                                    70̶71

CC.     Withholding.                                                    70̶72

XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN                 71̶72

A.      Certain Federal Income Tax Consequences of the Plan            71̶72

B.      In General.                                                     72̶73

C.      U.S. Holders of Claims.                                         73̶74

D.      Non-U.S. Holder of Claims.                                      73̶74

E.      Importance of Obtaining Professional Tax Assistance.            73̶74

XVI. RISK FACTORS                                                       74̶75

A.      Certain Bankruptcy Law Considerations                           74̶75

    1.      General                                                     74̶75

B.      The Chapter 11 Cases Could Adversely Affect the Debtors' Relations
        with Trade Vendors, Damage the Debtors' Reputation with
        Customers and Impair the Debtors' Ability to Retain or
        Attract High-Quality Personnel                                  74̶75

C.      Classification and Treatment of Claims and Equity Interests     74̶75

D.      Failure to Satisfy Voting Requirement                           75̶76

E.      Non-Confirmation or Delay of Confirmation of the Plan                    ~~75~~76

F.      Risk of Non-Occurrence of the Effective Date                             ~~75~~76

G.      Factors Affecting the Value of the Units to Be Issued Under the Plan of
        Reorganization                                                           ~~76~~77

        1.      ~~Competitive Conditions~~                                       76

H.      Variances from Projections                                              ~~76~~77

I.      Disruption of Operations                                                ~~76~~77

~~XVII. CONFIRMATION OF THE PLAN~~                                              76

XVII. confirmation of the plan                                                 77

A.      Confirmation Hearing                                                    ~~76~~77

B.      Requirements for Confirmation                                          77

C.      Classification of Claims and Interests                                 ~~77~~78

D.      Acceptance                                                             ~~77~~78

E.      Cramdown                                                               78

F.      Feasibility                                                            ~~78~~79

G.      Best Interest of the Creditors                                         ~~78~~79

        1.      Chapter 7                                                      79

        2.      Liquidation Analysis                                           ~~79~~80

H.      Alternatives to Confirmation of Plan                                   ~~81~~82

XVIII. CONCLUSION                                                              ~~82~~83

# I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), EZ Lube, LLC, *et al.*, the debtors and debtors in possession in the above-captioned cases ( the "Debtors"), hereby submit this disclosure statement (the "Disclosure Statement") in support of the *Joint Plan of Reorganization of EZ Lube, LLC, et al., Under Chapter 11 of the Bankruptcy Code* (the "Plan"). The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in Article I of the Plan shall also apply to capitalized terms used herein that are not otherwise defined. Any capitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan.

## II.

## INTRODUCTION AND OVERVIEW

The Debtors and their professionals believe that the Plan provides unsecured creditors with their only hope for obtaining a recovery on account of their prepetition claims against the Debtors. It is black letter bankruptcy law that the claims of secured creditors must be paid in full before distributions may be made to unsecured creditors. Here, as set forth in detail in the Liquidation Analysis contained in Article XVII(G)(2), the value of the Debtors' assets is not enough to satisfy the claims of the Debtors' secured creditors. This means that unsecured creditors are not entitled to any recovery.

Despite this fact, however, the Debtors have been able to negotiate a Plan with certain of their key creditor constituencies that provides for a distribution to be made to general unsecured creditors as set forth below. Depending upon the type of claim, and its classification under the Plan, general unsecured creditors will receive either a small cash distribution, and/or an interest in Reorganized EZ Lube, to be held for their benefit in the Plan Trust, whose ultimate value will depend upon the post-bankruptcy performance of Reorganized EZ Lube.

The Official Committee of Unsecured Creditors supports the Plan and urges unsecured creditors to vote in favor of the Plan.

### A.    Introduction

On December 9, 2008 (the "Petition Date"), the Debtors commenced the above-referenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors. A copy of the Plan accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of and pending litigation of and against the Debtors; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan. The Debtors strongly urge you to carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

On or about September ——,25, 2009, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not passed on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays or a chapter 7 liquidation. These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than October 23, 2009, at 7:00 p.m. prevailing Eastern Time.

## B. Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLC ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH PSZ&J HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## C.    **An Overview of the Chapter 11 Process**

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of a Chapter 11 petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. One official committee (the "Creditors' Committee") has been appointed in these Chapter 11 Cases, which represents the collective interests of general unsecured creditors.

A Chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization. Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation. A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and the equity interests of shareholders and holders of options or warrants. The provisions of the Debtors' Plan are summarized below.

## D.    **Plan Overview**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. The Plan is a plan of reorganization that provides for the post-bankruptcy emergence of Reorganized EZ Lube as an independent quick lube operator in California. Pursuant to the terms of the Plan, the Debtors shall convert approximately $94.5 million of claims into various Units in Reorganized EZ Lube, as set forth in detail below, in satisfaction of such claims. In addition, the Plan provides for the issuance of certain Management Units to be used by Reorganized EZ Lube in connection with the establishment of a Management Incentive Plan. The types of Units that will be issued by Reorganized EZ Lube will consist of Preferred Units, Common Units, and Management Units, as described below. The rights associated with the various types of Units are set forth in detail in Article X below.

Preferred Units.

Pursuant to the Plan, 499,000 preferred membership units in Reorganized EZ Lube, with an aggregate initial capital contribution value equal to the sum of (i) the Participating Pre-Petition Financing Claims, (ii) the DIP Claims of the Participating DIP Lenders in excess of $40,000,000, and (iii) the Exit Facilities Fee Amounts (the "Preferred Units") will be issued to the Participating Pre-Petition Lenders, the Participating DIP Lenders, and the Exit Lenders pursuant to Article 6.1(a) of the Plan. The identity of the Pre-Petition Lenders and the Participating DIP Lenders is set forth in the Plan, which is attached hereto as Exhibit A. The rights of the holders of Preferred Units are set forth in detail in Article IX(B)(1) and (E) below.

Class 2 claimants (i.e. the participating and non-participating Pre-Petition Lenders and the DIP Lenders) are receiving preferred units in Reorganized EZ Lube on account of their superior rights to the Debtors' collateral. But for the agreement of the Class 2 Claimants (which were heavily negotiated by the Debtors and several key creditor constituencies, including the Creditors' Committee), however, as set forth in the terms of the Plan, there would be no distributions to unsecured creditors in these cases, beyond potential recoveries on chapter 5 actions, if any. This is especially true since the vast majority of the Pre-Petition Lenders' claims were rolled-up into the DIP Obligations pursuant to the terms of the Final DIP Order.

Common Units and Establishment of the Plan Trust.

Pursuant to the Plan, Reorganized EZ Lube shall issue 501,000 common membership units to the Holders of Allowed: (i) Class 3 Claims (i.e. the Secured Claims of Second Lien Lenders), (ii) Class 5 Claims (i.e. the Mezzanine Debt Claims); and (iii) the Plan Trust to be held for the benefit of Class 6(b) Unsecured Claims (i.e. Critical Trade Vendors) and Class 6(c)

Unsecured Claims (i.e. General Unsecured Creditors). Reorganized EZ Lube shall issue to the Holders of Class 3-Allowed Second Lien Claims, Class 5-Allowed Mezzanine Debt Claims, and the Plan Trust for the benefit of the Holders of Allowed Class 6(b) Critical Trade Vendor Unsecured Claims and Allowed Class 6(c) General Unsecured Claims (or their representatives in the Cases) their Ratable Portion of the Common Units (which consist of 501,000 common membership units in Reorganized EZ Lube) as determined in accordance with the Plan. The rights of the holders of Common Units and the details concerning the Plan Trust are set forth in detail in Article IX(B)(2) and (C) below. In addition, on the Effective Date, the Debtors will assign to the Plan Trust the Transferred Claims, and the Plan Trust thereafter shall decide, in its sole discretion, whether to pursue any of such Transferred Claims.

The Claims of Claimants in Classes 3, 5, 6(b), and 6(c) are treated differently from the Claims of Claimants in Class 2. The Claims of the Class 2 Claimants are secured by substantially all of the Debtors' assets, and the overwhelming majority of such claims were rolled-up in the DIP Obligations pursuant to the Final DIP Order. Accordingly, Class 2 Claimants have superior rights to the Debtors' assets. Absent the negotiated compromises contained in the Plan, certain classes of claimants would not be entitled to any recoveries at all, beyond potential recoveries on chapter 5 actions, if any.

### Management Units.

Pursuant to the Plan, Reorganized EZ Lube shall issue or reserve 100,000 Management Units that shall be distributed to the Management Members in accordance with the terms of the Management Incentive Plan.

### Exit Facility.

Pursuant to the Plan, the Debtors shall exit their Chapter 11 Cases with a Senior Secured Exit Credit Facility (i.e. the Exit Facility) from GSSLG (or an affiliate of GSSLG to be identified and/or other financial institutions selected by GSSLG – i.e. the Exit Lenders) in the amount of $42 million, which shall be comprised of (a) a $2 million Revolving Facility, and (b) a $40 million Term Loan. The proceeds of (a) the Term Loan shall be used to repay in part the DIP Obligations on the Effective Date in accordance with the Plan and (ii) the Revolving Facility shall be used to fund the ongoing working capital requirements of Reorganized EZ Lube. On the Effective Date, GSSLG and the other Participating DIP Lenders shall convert, on a *pro rata* basis, $40.0 million of their respective obligations under the DIP Credit Agreement into loans and commitments under the Exit Facilities and the balance of their respective obligations under the DIP Credit Agreement (approximately $22.5 million) will be converted into the right to receive on the Effective Date Preferred Units having a value equal to such claims. In addition, in connection with consummation of the Exit Facilities, the Exit Lenders have agreed that, in lieu of the payment thereof in cash, such Exit Lenders will receive Preferred Units with respect to $2.5 million of fees and expenses relating to the Exit Facilities (the "Exit Facilities Fee Amounts").

1. Summary of Classification and Treatment of Claims and Interests under the Plan

The Plan provides for the satisfaction of three (3) categories of unclassified claims pursuant to the treatment mandated for such types of claims by the Bankruptcy Code, and designates eleven (11) Classes of Claims and one (1) Class of Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

a.    Unclassified Claims

The following charts briefly summarize the treatment to be provided to the Holders of unclassified claims. The amounts set forth below are estimates, and the actual Distributions received by the Holders of unclassified claims may vary.

| Class | Designation and Estimated Claim Amounts Ultimately Allowable | Impairment and Voting Rights | Treatment of Allowed Claims |
|---|---|---|---|
| N/A | Administrative Claims $897,000 | Unimpaired No Voting | Each Holder of an Allowed Administrative Claim shall be paid by the Debtors, at their election, in full, in cash, upon the latest of (i) the Effective Date or as soon thereafter as is reasonably practicable, (ii) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of such Debtor's business, consistent with past practices or (iii) such other, less favorable treatment as is agreed upon between the Holder of such Administrative Claim and the Debtors (or Reorganized EZ Lube)  Estimated Recovery: 100% |
| N/A | Priority Tax Claims $77,000 | Unimpaired No Voting | On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Priority Tax Claim shall be paid by the Debtors, in full and final satisfaction of such Holder's Allowed Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, (a) cash in an amount equal to the unpaid portion of such Allowed Claim, (b) payment of such Allowed Claim over a period not to exceed five (5) years plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date or such lesser rate as is agreed by a particular taxing authority, or (c) some other, less favorable treatment as is agreed upon by the Holder of such Allowed Priority Tax Claim and the Debtors (or Reorganized EZ Lube).[1]  Estimated Recovery: 100% |
| N/A | Professional Fee Claims $4,586,000 | Unimpaired No Voting | The Reorganized Debtors shall pay Professionals in cash all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date plus post-Effective Date fees approved by Reorganized EZ Lube.  Estimated Recovery: 100% |

[1] The Holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.

|  |  |  |  |
|--|--|--|--|

b.    Classified Claims[2]

i.    The following charts briefly summarize the treatment to be provided to the Holders of classified Claims and Interests. The amounts set forth below are estimates, and the actual Claims and Distributions may very.

| Class | Designation and Estimated Claim Amounts Ultimately Allowable | Impairment and Voting Rights | Treatment of Allowed Claims |
|--|--|--|--|
| 1 | Priority Non-Tax Claims $182,000 | Impaired Voting | Class 1 consists of the Priority Claims against the Debtors. The Reorganized Debtors shall pay the Allowed amount of each Class 1 Claim, without interest, to each Entity holding a Class 1 Claim, as soon as practicable following the later of: (a) the Effective Date and (b) the date such Class 1 Claim becomes an Allowed Claim (or as otherwise permitted by law), provided, however, that any Entity Holding a Class 1 Claim may be treated on such less favorable terms as may be agreed to in writing by such Entity. |
| 2(a) | Pre-Petition Financing Claims of Non-Participating Pre-Petition Lenders $~~218,000~~[3]0 | Unimpaired Not Voting | Class 2(a) consists of all Pre-Petition Financing Claims of Non-Participating Pre-Petition Lenders. The Non-Participating Pre-Petition Lenders shall be paid by the Debtors (from the proceeds of the Exit Facilities or otherwise) on the Effective Date, in full and complete satisfaction, settlement, release of, and in exchange for their respective Pre-Petition Financing Clams, cash in an amount equal to the unpaid portion of such Non-Participating Pre-Petition Lender's Allowed Prepetition Financing Claim to the extent not paid prior to the Effective Date. |
| 2(b) | Pre-Petition Financing Claims of Participating Pre-Petition Lenders $~~1,096,000~~[4]1,314,000[3] | Impaired Voting | Class 2(b) consists of all Pre-Petition Financing Claims of Participating Pre-Petition Lenders. The Participating Pre-Petition Lenders shall on the Effective Date, in full and complete satisfaction, settlement, release of, and in exchange for their respective Pre-Petition Financing Claims, receive distributions of their respective Ratable Portion of the Preferred Units. The number of Preferred Units distributable to each Participating Pre-Petition Lender shall be determined based upon the ratio of the amount of Pre-Petition Financing Claims held by each Pre-Petition Lender compared to the total amount of Pre-Petition Financing Claims of all Participating Pre-Petition Lenders, the DIP Claims of the Participating DIP Lenders in excess of $40,000,000 in the aggregate and the Exit Facilities Fee Amounts. |
| 2(c) | DIP Claims of | Unimpaired | Class 2(c) consists of all DIP Claims of Non-Participating DIP |

---

[2] The charts are only a summary of the classification and treatment of Claims and Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

[3] ~~This amount consists of pre-petition accrued and default interest payable to GSO on a pro-rata basis. This amount assumes that GSO does not participate; however, GSO's intentions are unknown at this time.~~

[4]3 This amount represents GSSLG's pro-rata claim to pre-petition accrued and default interest on the pre-petition terms and revolving loans.

| | | | |
|---|---|---|---|
| | Non-Participating Lenders<br><br>$~~8,438,000~~[5]0 | Not Voting | Lenders.  The Non-Participating DIP Lenders shall be paid by the Debtors (from the proceeds of the Exit Facilities or otherwise) on the Effective Date, in full and complete satisfaction, settlement, release of, and in exchange for their respective DIP Claims, cash in an amount equal to the unpaid portion of the DIP Claims of such Non-Participating DIP Lender to the extent not paid prior to the Effective Date. |
| 2(d) | DIP Claims of Participating DIP Lenders<br><br>$~~54,039,000~~[6]6<br>2,477,000[6] | Impaired Voting | Class 2(d) consists of all DIP Claims of Participating DIP Lenders. The Participating DIP Lenders shall convert and/or receive on the Effective Date, in full and complete satisfaction, settlement, release of and in exchange for, their respective DIP Claims: (i) to the extent of such Participating DIP Lender's Ratable Portion of the DIP Claims of all Participating DIP Lenders equaling $40,000,000, such DIP Claims shall on the Effective Date (and without further actions by the parties) be converted into loans and commitments under the Exit Facilities and such loans and commitments shall remain outstanding in accordance with (and be secured by all collateral pledged in respect of) the Exit Facilities; and (ii) to the extent such Participating DIP Lenders Ratable Portion of the DIP Claims of all Participating DIP Lenders which are in excess of $40,000,000, the Debtors shall on the Effective Date issue to each such Participating DIP Lender their respective Ratable Portion of the Preferred Units on account of such excess.  The number of Preferred Units distributable to each Participating DIP Lender shall be determined based upon the ratio of the amount of DIP Claims held by such Participating DIP Lender compared to the total amount of Pre-Petition Financing Claims of all Participating Pre-Petition Lenders, the DIP Claims of the Participating DIP Lenders in excess of $40,000,000 in the aggregate and the Exit Facilities Fee Amounts. |
| 3 | Secured Claims of Second Lien Lenders<br><br>$29,470,000 | Impaired Voting | Class 3 consists of the Allowed Second Lien Claims.  On the Effective Date, the Holders of the Second Lien Claims shall receive in full and complete satisfaction, discharge and release of, and in exchange for, of such Second Lien Lender's Allowed Second Lien Claims, a distribution of their respective Ratable Portion of the Common Units.  The number of Common Units distributable to each Second Lien Lender shall be determined based on the ratio of the amount of the Allowed Second Lien Claims held by such Second Lien Lender compared to the total amount of all Allowed Second Lien Claims, Allowed Mezzanine Debt Claims and Allowed Class 6(b) and 6(c) Unsecured Claims. |
| 4 | Miscellaneous Other Secured Claims<br><br>$443,000 | Unimpaired Not Voting | Class 4 consists of all other Allowed Secured Claims, each of which, if any, shall constitute a subclass.  To the extent any Class 4 Claimant exists, at the option of Reorganized EZ Lube, as applicable, (i) each Holder (if any) of an Allowed Class 4 Claim shall receive on the Distribution Date or as soon thereafter as practicable cash in an amount equal to the value of the Creditor's interest in the collateral securing such Claim in full and complete satisfaction of such Claim, or (ii) the collateral securing such Creditor's Claim shall be abandoned to such Creditor, in full and complete satisfaction of such Claim. |

---

[5] ~~This amount represents GSO's pro-rata share of the rolled-up DIP loan.  This amount assumes that GSO does not participate; however, GSO's intentions are unknown at this time.~~

[6] Excluding the professional fee carve-out, per the terms of the Final DIP Order, GSSLG's Class 2(d) Claim is $49,453,000.

| 5 | Claims of Mezzanine Debt Holders<br><br>$17,143,000 | Impaired Voting | Class 5 consists of all Allowed Mezzanine Debt Claims. On the Effective Date, the Holders of Mezzanine Debt Claims shall receive in full and complete satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Mezzanine Claims, a distribution of their respective Ratable Portion of the Common Units. The number of Common Units distributable to each Holder of Allowed Mezzanine Debt Claims shall be determined based on the ratio of the amount of such Holder's Allowed Mezzanine Debt Claims compared to the total amount of all Allowed Second Lien Claims, Allowed Mezzanine Debt Claims, and Allowed Class 6(b) and 6(c) Unsecured Claims. |
| 6(a) | Unsecured Claims (Convenience Class)<br><br>$395,000 | Impaired Voting | Class 6(a) consists of all Allowed Convenience Claims, which are comprised of Unsecured Creditors (i) holding Allowed General Unsecured Claims with an aggregate value not to exceed $5,000 or (ii) who elect to reduce all of their General Unsecured Claims to $5,000 and accept treatment in Class 6(a) in lieu of treatment in Class 6(c). Class 6(a) Unsecured Creditors will receive on the Distribution Date in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Holder's Class 6(a) Unsecured Claims, cash distributions in an amount equal to twenty-five percent (25%) of such Holder's Allowed Class 6(a) Unsecured Claims. |
| 6(b) | Unsecured Claims (Critical Trade Vendors)<br><br>$2,311,000 | Impaired Voting | Class 6(b) consists of all Allowed Critical Trade Vendor Claims, which are comprised of the claims of critical trade vendors (as determined by the Debtors, in their sole discretion) who (i) are Unsecured Creditors holding Allowed General Unsecured Claims, (ii) are included on Schedule 5.6(b) to the Plan, (iii) have agreed to accept treatment in Class 6(b) in lieu of treatment in Class 6(c), and (iv) agree in writing to provide Reorganized EZ Lube acceptable trade terms for periods following the Effective Date. Class 6(b) Claimants shall receive on the Effective Date distributions of such Class 6(b) Unsecured Creditor's Ratable Portion of beneficial interests in the Plan Trust (as described in Article 6.1(c) of the Plan). The Plan Trust, on behalf of the Holders of Allowed Class 6(b) Claims shall receive in full and complete satisfaction, settlement, release, and discharge of, and in exchange for, all Allowed Class 6(b) Claims, a distribution of the respective Ratable Portion of the Common Units. The number of Common Units distributable to the Plan Trust on behalf of the Holder of Allowed Class 6(b) Claims shall be determined based on the ratio of the amount of the aggregate amount of Allowed Class 6(b) Claims compared to the total amount of all Allowed Second Lien Claims, Allowed Mezzanine Debt Claims, and Allowed Class 6(b) and Class 6(c) Unsecured Claims. The amount of beneficial interests in the Plan Trust distributable to each Class 6(b) Unsecured Creditor shall be determined based on the amount of the Class 6(b) Unsecured Claims of such Class 6(b) Unsecured Creditor to the aggregate amount of all Allowed Class 6(b) Unsecured Claims and Allowed Class 6(c) Unsecured Claims. In addition, provided Class 6(b) votes in favor of the Plan, Class 6(b) Claimants may receive a cash distribution, through payment to the Plan Trust, if certain performance criteria are met by Reorganized EZ Lube, or the occurrence of a Sale Event, pursuant to the criteria set forth in |

| | | | |
|---|---|---|---|
| | | | Article 5.6(b) of the Plan.[75] Finally, on the Effective Date, the Debtors will assign to the Plan Trust the Transferred Claims, and the Plan Trust thereafter shall decide, in its sole discretion, whether to pursue any of such Transferred Claims. |
| 6(c) | Unsecured Claims (General Unsecured Creditors) $20,554,000 | Impaired Voting | Class 6(c) consists of all Allowed General Unsecured Claims other than Second Lien Claims, Mezzanine Debt Claims, Convenience Class Claims or Critical Trade Vendor Claims.  The Plan Trust, on behalf of the Holders of Allowed Class 6(c) Claims shall receive in full and complete satisfaction, settlement, release, and discharge of, and in exchange for, all Allowed Class 6(c) Claims, a distribution of the respective Ratable Portion of the Common Units.  The number of Common Units distributable to the Plan Trust on behalf of the Holder of Allowed Class 6(c) Claims shall be determined based on the ratio of the amount of the aggregate amount of Allowed Class 6(c) Claims compared to the total amount of all Allowed Second Lien Claims, Allowed Mezzanine Debt Claims, and Allowed Class 6(b) and Class 6(c) Unsecured Claims. Class 6(c) Claimants shall receive on the Effective Date, distributions of such Class 6(c) Unsecured Creditor's Ratable Portion of beneficial interests in the Plan Trust (as described in Article 6.1(c) of the Plan).  The amount of beneficial interests in the Plan Trust distributable to each Class 6(c) Unsecured Creditor shall be determined based on the amount of the Class 6(c) Unsecured Claims of such Class 6(c) Unsecured Creditor to the aggregate amount of all Allowed Class 6(b) Unsecured Claims and Allowed Class 6(c) Unsecured Claims.  In addition, provided Class 6(c) votes in favor of the Plan, Class 6(c) Claimants may receive a cash distribution, through payment to the Plan Trust, if certain performance criteria are met by Reorganized EZ Lube, or the occurrence of a Sale Event, pursuant to the criteria set forth in Article 5.6(c) of the Plan.  Finally, on the Effective Date, the Debtors will assign to the Plan Trust the Transferred Claims, and the Plan Trust thereafter shall decide, in its sole discretion, whether to pursue any of such Transferred Claims. |
| 7 | Interests | Impaired No Voting | No distributions.  All Interests to be cancelled as of the Effective Date. |

## 2.  Exhibits to the Disclosure Statement

Attached as Exhibits to this Disclosure Statement are copies of the following:

- the Plan (Exhibit A);

- the Term Sheet for the Exit Facilities (Exhibit B);

- the Critical Vendor List (Exhibit C);

- the Debtors' Financial Projections (Exhibit D);

---

[75] In addition, to the extent (i) Class 6(b) has voted to approve the Plan and (ii) Class 6(c) has not voted to approve of the Plan, the Class 6(b) Unsecured Creditors shall also receive the amounts, if any, that would have been payable to Class 6(c) Unsecured Creditors on account of the Class 6(c) Distribution Amounts or the Alternative Class 6(c) Distribution Amounts, as applicable, as set forth in Section 5.6(c) of the Plan.

- the Debtors' Liquidation Analysis (Exhibit E)

- the Debtors' Hypothetical Sale Recovery Analysis (Exhibit F).

By no later than five (5) Business Days before the Ballot Deadline, the Debtors shall file the Plan Supplement, which, without limitation, shall consist, in substantially final form, of the following documents: (a) new organizational documents for Reorganized EZ Lube; (b) Schedule 7.1 (which is the list of Executory Contracts that will be rejected pursuant to Article 7.1 of the Plan); (c) Schedule 7.2 (which lists the cure claims that must be paid to assume Executory Contracts pursuant to Article 7.2); (d) the form of the Management Incentive Plan (if available prior to such date), (e) the form of governing documents for the Plan Trust, and (f) disclosure with respect to the identity and title of officers and directors of Reorganized EZ Lube.

## E.    **Voting on the Plan**

### 1.  Who May Vote

Each Holder of an Allowed Claim in Classes 1, 2(b), 2(d), 3, 5, 6(a), 6(b) and 6(c), is entitled to vote either to accept or to reject the Plan.  Only those votes cast by Holders of Allowed Claims in the above-noted Classes shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.  An impaired Class of Claims shall have accepted the Plan if:  (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. The Holders of Class 2(a), Class 2(c), and Class 4 Claims are unimpaired under the Plan, and are therefore not entitled to vote.  The Holders of Class 7 Interests shall not receive any distributions under the Plan and are therefore deemed to reject the Plan and are not entitled to vote.  Because Class 7 is deemed to reject the Plan by operation of law, the Debtors will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

### 2.  How to Vote

All votes to accept or to reject the Plan must be cast by using the appropriate form of Ballot.  No votes other than ones using such Ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court.  A form of Ballot is being provided to Creditors in Classes 1, 2(b), 2(d), 3, 5, 6(a), 6(b), and 6(c) by which Creditors in such Classes may vote their acceptance or rejection of the Plan.  The Ballot for voting on the Plan gives Holders in the above-noted Classes one important choice to make with respect to the Plan – you can vote for or against the Plan.  To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the ballot in

the envelope provided for this purpose. Kurtzman Carson Consultants LLC ("KCC"), as the Claims, Notice and Balloting Agent, will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE DEBTORS' CLAIMS, NOTICE AND BALLOTING AGENT, KCC, BY NO LATER THAN 7:00 P.M. PREVAILING EASTERN TIME ON OCTOBER 23, 2009 AT THE FOLLOWING ADDRESS:

**EZ Lube Ballot Processing Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

**DO NOT SEND YOUR BALLOT VIA FACSIMILE OR E-MAIL.**

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

**F.**    **Confirmation of the Plan**

       1.    Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article XVII below.

       2.    Objections to Confirmation

Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court, and served on the counsel for the parties set forth below, on or before October 23, 2009 at 4:00 p.m. Eastern Time. Bankruptcy Rule 3007 governs the form of any such objection.

Counsel on whom objections must be served are:

> Counsel for the Debtors
> Laura Davis Jones, Esq.
> David M. Bertenthal, Esq.
> Curtis A. Hehn, Esq.
> Pachulski Stang Ziehl & Jones LLP
> 919 North Market St., 17th Floor
> Wilmington, DE  19801

Counsel for the Committee
Francis J. Lawall, Esq.
James C. Carignan, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19801

Counsel for GSSLG
John Schneider, Esq.
Hunton & Williams, LLP
600 Peachtree Street, N.W., Suite 4100
Atlanta, GA  30308
and

Tyler Brown, Esq.
Hunton & Williams, LLP
951 E. Byrd Street
Riverfront East Tower
Richmond, VA  23219


United States Trustee
David Buchbinder, Esq.
844 King Street, Room 2207
Lockbox #35
Wilmington, DE  19899-0035


3.    Hearing on Confirmation

        The Court has set October 30, 2009 at 10:00 a.m. Eastern Time for a hearing (the
"Confirmation Hearing") to determine whether the Plan has been accepted by the requisite
number of Creditors and whether the other requirements for confirmation of the Plan have been
satisfied. The Confirmation Hearing will be held in the United States Bankruptcy Court for the
District of Delaware, located at 824 North Market Street, 5th Floor Courtroom 6, Wilmington, DE
19801, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge.  The
Confirmation Hearing may be continued from time to time and day to day without further notice.
If the Court confirms the Plan, it will enter the Confirmation Order.

## III.

## HISTORY, ORGANIZATION AND
## ACTIVITIES OF THE DEBTOR

### A.    Overview of the Debtor and its Operations

#### 1.  Overview of the Debtors

As of the Petition Date, Debtor EZ Lube, LLC ("EZ Lube") was the largest independent quick lube operator in California and one of the largest privately owned companies of its type in the United States. Debtor Xpress Lube-Tech, Inc. ("Xpress") is a wholly owned subsidiary of EZ Lube. Prior to filing for bankruptcy protection, the Debtors had 82 retail service locations, including 78 in Southern California and four locations in Arizona, each operating under the name "EZ Lube." Servicing over a million cars per year, the Debtors provide oil change and related services for automobiles, including: oil filter replacement; lubricating chassis; checking/filling power steering, battery, gearbox, and brake fluid levels; providing preventive and other maintenance services relating to fuel systems, transmissions, and radiators; and providing various related or similar services.

Prior to the Petition Date, the Debtors' operating performance declined and their business was negatively impacted by various factors, including the national economic downturn, high gas prices during much of 2008, and changes in operations implemented in response to negative publicity and an agreement with the California Department of Consumer Affairs/Bureau of Automotive Repair. As a result, the Debtors' earnings and cash flow declined well below the levels required to service their significant debt. Given this situation, the Debtors decided to file for bankruptcy protection on December 9, 2008 (i.e. the Petition Date), and initially sought to sell substantially all of their assets under Bankruptcy Code section 363 in order to maximize value for the Estates and Creditors.

#### 2.  Business Growth & Operations

Based in Santa Ana, California, the Debtors had, as of the Petition Date, a total of 82 store locations throughout Southern California and in Arizona. Beginning in 1988 with one store location, EZ Lube and prior to EZ Lube's existence, its predecessor, EZ Lube, Inc., steadily increased its number of store locations each year through June 2008, by building new stores on leased properties and acquiring leasehold interests and substantially all of the assets of various individually-run stores from numerous operators. Typically, the purchase transactions and construction projects were funded by accessing the Debtors' various financing facilities. As of the Petition Date, the Debtors leased all of their store locations and their headquarters facility in Santa Ana.

Among the purchase transactions undertaken by EZ Lube prior to the Petition Date was its purchase in 2004 of Xpress, which initially had one oil change store location in Riverside, California. For certain business reasons, in contrast to its other store purchases, EZ Lube

acquired all of the common stock of this company, instead of only its assets. As in the case with all of the EZ Lube's stores, Xpress' store location operated under the "EZ Lube" name.

On a consolidated basis (unaudited), for the year ended December 31, 2007, the Debtors had total assets of approximately $113.2 million, including approximately $41.5 million (net) in property and equipment, approximately $2.2 million in inventory, and approximately $2.6 million in cash, and total liabilities of approximately $114.4 million, including approximately $93.6 million owed to their secured lenders and subordinated noteholders. In 2007, the Debtors had a net loss of approximately $44.0 million (after taking into account income taxes). The Debtors' sales for the 10 month period ending October 31, 2008 were approximately $66.8 million, as compared to $73.4 million for the 10 month period ended October 31, 2007. As of October 31, 2008, the Debtors had incurred a net loss of approximately $9.9 million. As discussed below, the Debtors' operating performance has declined due to the national economic downturn and other factors.

### 3. The Debtors' Equity Structure and Management

EZ Lube Inc., EZ Lube's predecessor, was formed in 1988 by its founders, Michael Dobson and Richard Teasta. In December 2005, EZ Lube Inc. merged with newly formed EZ Lube (formed in October 2005 for purposes of the transaction), with EZ Lube emerging as the surviving company (the "Merger") pursuant to that certain Acquisition Agreement, dated as of December 14, 2005 (the "Acquisition Agreement"). All business operations formerly conducted by EZ Lube Inc. were continued by EZ Lube. Pursuant to the Acquisition Agreement, Michael Dobson and Richard Teasta, the former sole shareholders of EZ Lube, Inc. (the "Sellers"), in effect sold 75% of their stake in EZ Lube Inc. to a third party, EZL-II Investment Inc. ("EZL-II"). The Sellers retained a 25% interest, held either directly (individually) or indirectly through an entity formed in connection with the Merger, EZL-I Investments, Inc. ("EZL-I").

Since the Merger, the Sellers' minority stake in EZ Lube has increased (either held directly or indirectly through EZL-I) to approximately 28%, and EZL-II's majority stake has decreased to approximately 69%, as reflected in the List of Equity Security Holders appended to the Debtors' voluntary petitions ("Equity Holders List"). Affiliates of GSO Capital Partners, LP (a lender to the Debtors) ("GSO") have minority equity interests in EZ Lube. As noted, Xpress is a wholly owned subsidiary of EZ Lube. As set forth in the Equity Holders List filed in these Chapter 11 Cases, EZ Lube also has four classes of preferred units, which are held in varying amounts by Dobson, Teasta and EZL-I; EZL-II; GSO affiliates; and/or certain other investors. Xpress has not issued any preferred stock.

### 4. Prepetition Financing and Significant Indebtedness

The 2005 Merger was consummated to provide additional financing and strategic resources to the Debtors and to assist them in the implementation of their growth plans. As explained below, the financing for the transaction totaled approximately $136 million and was provided by a first lien term loan that was a renewal of an existing loan of $40 million, and of a revolving credit line that had borrowings at the time of approximately $1.6 million (out of $15 million total availability under the revolving credit line), a second lien term loan of $35 million, unsecured subordinated notes issued in the amount of $15 million, and equity investment of $45

million (including rollover equity by continuing members of approximately $13 million). As of the Petition Date, the Debtors had approximately $100 million outstanding under their credit facilities and subordinated notes.

### a.    First Lien Credit Arrangement

EZ Lube, GSSLG, as administrative agent, collateral agent, lead arranger, syndication agent and document agent for itself (the "First Lien Agent") and as a lender, and certain other lenders (together with GSSLG, the "First Lien Lenders") are parties to that certain Amended and Restated Credit Agreement, dated as of December 13, 2005 (as amended, modified and/or supplemented from time to time and together with the related Security Agreement and other documents, the "First Lien Credit Documents"). EZ Lube's obligations under the First Lien Credit Documents are secured by substantially all of its assets (the "First Lien Collateral"). Pursuant to the First Lien Credit Documents, EZ Lube was provided with renewed loan availability for aggregate borrowings of up to $55 million, consisting of a five year revolving credit facility of up to $15 million in revolving credit loans and letters of credit and a five-year term loan of $40 million (the "First Lien Term Loan"). Xpress is a guarantor of EZ Lube's obligations owed under the First Lien Credit Documents and has granted the First Lien Lenders a senior security interest in substantially all of its assets. As of the Petition Date, the Debtors owed approximately $16 million under the Revolver, the credit line for which had been increased to up to $17 million, and approximately $37.5 million under the First Lien Term Loan and guaranty (the "First Lien Obligations").

### b.    Second Lien Credit Arrangement

EZ Lube as borrower and the Second Lien Lenders are parties to that certain credit agreement, dated as of December 13, 2005 (as amended, modified and/or supplemented from time to time and together with the related Security Agreement and other documents, the "Second Lien Credit Documents"). Pursuant to the Second Lien Credit Documents, EZ Lube was provided with a seven-year term loan of $35 million (the "Second Lien Term Loan"). As of the Petition Date, the Debtors owed approximately $29.5 million under the Second Lien Term Loan (with interest accrued thereon, the "Second Lien Obligations"). The obligations under the Second Lien Credit Documents are secured by substantially all of the Debtors' assets and are junior only to the liens provided under the First Lien Credit Documents (the "Pre-Petition Collateral"). Xpress is a guarantor of EZ Lube's obligations owed under the Second Lien Credit Documents and has granted the Second Lien Lenders a security interest in substantially all of its assets junior only to the liens granted pursuant to the First Lien Credit Documents. The First Lien Lenders' and Second Lien Lenders' respective rights vis-à-vis each other are set forth in an Intercreditor Agreement dated as of December 13, 2005 (as amended, modified and/or supplemented from time to time).

### c.    Subordinated Notes

Pursuant to that certain Note Purchase Agreement dated as of December 13, 2005, as amended, EZ Lube issued 14% Senior Subordinated Notes due December 2013 (the "Subordinated Notes"), in the aggregate principal amount of $15 million, to certain affiliates of GSO Partners LP (collectively, the "Noteholders"). EZ Lube's obligations to pay the

Subordinated Notes are unsecured and are guaranteed by Xpress. Further, these obligations are junior and subordinate in right of payment to the prior payment in full in cash of the First Lien Lenders and Second Lien Lenders, subject to the terms and conditions set forth in the Note Purchase Agreement. As of December 31, 2007, interest on the Notes was payable at 15% per annum, with 11% paid in cash quarterly in arrears and 4% paid in kind as additions to principal. As of the Petition Date, more than approximately $17.1 million was outstanding under the Subordinated Notes.

d.     <u>Other Significant Indebtedness</u>

In addition to the above-noted indebtedness owed under (i) the First Lien Credit Documents, (ii) the Second Lien Credit Documents, and (iii) the Subordinated Notes, the Debtors owe approximately $9 million in trade debt and rent obligations, as well as approximately $2 million (most of which is contingent) in settlement and other amounts in connection with certain prepetition litigation.

<u>5.</u>  <u>Circumstances Leading to the Commencement of the Chapter 11 Cases</u>

a.     <u>National Economic Downturn and Declining Operating Performance</u>

The deteriorating national economy negatively impacted the Debtors' business. Decreased consumer confidence and worsening financial conditions caused many customers to drive more miles between services, foregoing oil changes and other services, or to select less expensive service options offered by the Debtors. Moreover, the high gas prices experienced over much of 2008 resulted in customers driving fewer miles on average, and thus, oil changes and other services needing to be performed less frequently, leading to lower sales. The development and implementation of changes in the Debtors' operating practices in response to negative publicity and an agreement with the California Department of Consumer Affairs/Bureau of Automotive Repair (discussed further below) also negatively impacted the Debtors' level of sales.

Such circumstances contributed to the Debtors' declining performance. The Debtors' sales for the 10 month period ending October 31, 2008 were approximately $66.8 million, as compared to $73.4 million for the 10 month period ended October 31, 2007. As of October 31, 2008, for the overall company, the Debtors' year to date sales were down nearly 8.9% as compared to the prior year; the total number of cars serviced by the Debtors was down 11.2%; and the average amount charged to customers on service visits declined 3.2%.

b.     <u>Prepetition Credit Obligation Defaults</u>

Prior to the Petition Date, the Debtors owed over $100 million under their credit facilities and the Subordinated Notes. With current annual debt service charges of approximately $12 million (as compared to Debtors' total annual sales in 2007 of approximately $88 million), the Debtors experienced difficulty in making certain of their debt service payments. Starting in April, 2008, the Debtors failed to make their interest payments owed under the Subordinated Notes and Second Lien Credit Documents. In October, 2008, the Debtors failed to make interest payments under the First Lien Credit Documents and also allegedly failed to meet certain other

covenants thereunder. The Debtors' obligations were cross-defaulted and thus, the asserted defaults under the First Lien Credit Documents triggered, in turn, defaults under the Second Lien Credit Documents and the Subordinated Notes. Subsequently, the Debtors entered into agreements with the First Lien Lenders, the Second Lien Lenders, and Subordinated Noteholders providing for short extensions of time for the Debtors to make debt service interest payments. Prior to the Petition Date, the Debtors were able to pay the October (but not November or December 2008) accrued interest to the First Lien Lenders but not any accrued interest to the Second Lien Lenders or Subordinated Noteholders. The parties did not enter into any formal forbearance agreements prior to the Petition Date.

c.    <u>Negative Publicity and Prepetition Litigation</u>

Starting in 2003, EZ Lube was the subject of certain reports by the local NBC affiliate in Los Angeles, portraying EZ Lube in a negative light, alleging pressure sales and nonperformance of services. In all likelihood, such negative media attention damaged some customers' perceptions of EZ Lube.

Further, subsequent to the Merger, the Debtors were named in certain complaints and proceedings, including (a) class action lawsuits in California state court alleging violations by EZ Lube of certain California overtime wage and meal period labor laws and other statutes, (b) an August 2006 complaint by the California Department of Consumer Affairs/Bureau of Automotive Repair (the "DCA/BAR") (filed with the Director of Consumer Affairs) (the "DCA/BAR Complaint"), claiming violations of, inter alia, the DCA/BAR rules and regulations under the California Business & Professions Code, including allegations of certain untruthful or misleading actions to sell service and parts to customers, and (c) a related assertion of claims based on the DCA/BAR Complaint by the Office of the District Attorney for Orange County, California. For various reasons, in certain cases, EZ Lube entered into settlements requiring payments to class members and other plaintiffs' counsel and other actions. With respect to most of such settlement related monetary obligations, the Sellers indemnified EZ Lube in whole or in part pursuant to the Acquisition Agreement and/or other agreements. In connection with certain such proceedings, EZ Lube also developed and implemented changes in the Debtors' operating practices, which may have negatively impacted the Debtors' level of sales.

## B.    <u>The Commencement of the Chapter 11 Cases</u>

The foregoing circumstances – namely, the economic forces causing a decline in the Debtors' operating performance, insufficient cash flow to support the debt structure, a default situation with their major creditors, and adverse publicity and attendant costs surrounding the DCA/Bar Complaint – contributed to the Debtors' current financial position and their decision to seek bankruptcy protection. In order to maximize the value of their business and assets for the benefit of creditors, the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware on the Petition Date. No trustee or examiner has been appointed in the Chapter 11 Cases. The Creditors' Committee was appointed on December 22, 2008 to represent the interests of Debtors' unsecured creditors.

As set forth in detail below, the Debtors initially contemplated the sale of substantially all of their assets to a stalking horse purchaser pursuant to the terms of an asset purchase agreement.

Prior to the auction, however, the stalking horse purchaser withdrew its bid pursuant to the terms of the asset purchase agreement. No other parties submitted bids for the purchase of substantially all of the Debtors assets, and the Debtors continued the Sale Hearing. After the continuation of the Sale Hearing, the Debtors were able to negotiate the Plan with certain of their secured lenders and certain other key creditor constituencies.

**IV.**

**FIRST DAY MOTIONS AND OTHER RELIEF**

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, its voluntary petitions. The Debtor sought this relief to minimize disruption of the Debtors' business operations as a result of the chapter 11 filing, to establish procedures in the Chapter 11 Cases regarding the administration of the Chapter 11 Cases and interim compensation for Estate professionals, and to facilitate reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Cases addressed the following issues, among others:

**A.      Employees**

As of the Petition Date, the Debtors employed nearly 1,000 employees, comprised of approximately 829 full-time and 150 part-time workers (collectively, the "Employees"), to perform the functions necessary to operate the Debtors' business. Approximately 575 Employees worked as service technicians at the Debtors' stores; approximately 193 Employees were store managers, assistant managers or managers in training; approximately 109 worked as cashiers; approximately 50 served as service crew chiefs; and approximately 71 Employees worked or are based in the Santa Ana corporate office, providing executive, operations and/or administrative services. None of the Employees were members of a union. Approximately 118 of the Employees were salaried, and the remaining Employees were compensated on an hourly basis. In order to minimize the personal hardships the Employees would suffer if prepetition employee-related obligations were not paid when due or honored as expected, and to maintain the morale of the Employees, the Debtors, on the Petition Date, filed the *Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363 and 507(a) for an Order Authorizing the Debtor to (I) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor and Pay Certain Checks Presented for Payment and to Honor Certain Fund Transfer Requests [Docket No. 9] (the "Wages Motion").*

Pursuant to the Wages Motion, the Debtors sought authority, in their discretion, to pay and/or honor, as the case may be, certain prepetition claims for, among other items, wages, salaries, and other compensation solely for continuing Employees, as well as to honor paid time off, fixed holidays, medical benefits, contributions to employee benefit plans, and other employee benefits offered by the Debtor for Employees that the Debtors historically had paid in the ordinary course of their business, to reimburse certain reimbursable unpaid Employee reimbursement obligations solely for continuing Employees, and to pay all costs incident to the

foregoing. On December 10, 2008, the Court entered its order authorizing the payment of certain prepetition employees related claims and the continuation of certain employee benefits postpetition [Docket No. 44].

## B.    Cash Management

Prior to the commencement of the Chapter 11 Cases, the Debtors, in the ordinary course of their business, maintained various bank accounts from which they managed their cash receipts and disbursements. The Debtors' cash management system is an integrated network of bank accounts that facilitates the timely and efficient collection, management and disbursement of funds used by the Debtors in their business. Given the integrated nature of their cash management system, and the disruption that would be caused to their businesses if the Debtors were forced to close their existing accounts and open new accounts, the Debtors, on the Petition Date, filed the *Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, and (IV) Providing Administrative Priority Status to Intercompany Claims and (V) Waiver of Section 345(b) Deposit and Investment Requirements [Docket No. 14]* (the "Cash Management Motion").

Pursuant to the Cash Management Motion, the Debtors sought authority to (a) maintain their existing bank accounts and to pay any prepetition routine banking fees imposed by the debtors' financial institutions where the bank accounts are maintained, (b) continue to use their existing business forms, (c) continue to use their existing cash management system, (d) provide administrative priority to postpetition intercompany claims, and (e) waive the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code. The Court entered its order granting the relief requested by the Debtors in respect of its cash management system and related relief on December 10, 2008 [Docket No. 48] and a final order on the Debtors' request to waive the section 345(b) requirements of the Bankruptcy Code on January 12, 2009 [Docket No. 132].

## C.    Taxes

In the normal operation of their business, the Debtors pay an assortment of sales and use taxes (the "Sales and Use Taxes") to various federal, state, and local taxing authorities (the "Taxing Authorities"), and pays various regulatory fees ("Regulatory Fees") to federal, state, and local regulatory authorities (collectively, the "Regulatory Authorities," and together with the Taxing Authorities, the "Taxing and Regulatory Authorities"). As of the Petition Date, the Debtors estimated their outstanding Sales and Use Taxes were approximately $451,000, and their outstanding Regulatory Fees were approximately $25,000. On the Petition Date, the Debtors filed the Debtors' *Motion for an Order (I) Authorizing the Debtors to Pay Prepetition Sales and Use Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto [Docket No. 21]* (the "Tax Motion"). Pursuant to the Tax Motion, the Debtors sought authority, in their sole discretion, to pay any unpaid Sales and Use Taxes and Regulatory Fees owed to the Taxing and Regulatory Authorities. The Court granted the Debtors such authority by order entered on December 10, 2008 [Docket No. 46].

**D.    Utilities**

In the normal course of their business, the Debtors have relationships with 95 utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity and related services (the "Utility Services") for 316 separate accounts. Inasmuch as the Debtors did business with many utilities, it was imperative that "additional assurance" procedures be established for the efficient administration of the Debtors' responsibilities under section 366 of the Bankruptcy Code. Accordingly, on the Petition Date, the Debtors filed the Debtors' Motion *for the Entry of Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment [Docket No. 6]* (the "Utility Motion"). On December 10, 2008, the Court entered its interim order implementing the procedures proposed by the Debtors to ensure adequate assurance of future payment to utility service providers [Docket No. 45]. A final order was entered on January 12, 2009 [Docket No. 130].

**E.    Interim Compensation for Professionals**

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code [Docket No. 11]* (the "Interim Compensation Motion"). Pursuant thereto, the Debtors sought authority to implement procedures for the application, interim allowance and payment of Estate Professionals on a monthly basis. On January 12, 2009, the Court entered its order (the "Interim Fee Order") approving the monthly compensation procedures proposed by the Debtor [Docket No. 133].

**F.    Rejection of Certain Unexpired Leases of Nonresidential Real Property**

Prior to filing for bankruptcy protection, the Debtors reviewed their stores in order to, among other things, ascertain those locations that were unnecessary and burdensome to the Debtors' ongoing business. The annual rent payable by the Debtors on account of the leases to be rejected totaled approximately $749,916. As a result of such undertaking, the Debtors, on the Petition Date, moved to reject the non-residential real property leases for 9 such locations, pursuant to that certain *Motion for Order Under Section 365(a) and 554(a) of the Bankruptcy Code Authorizing the Debtors to (1) Reject Certain Unexpired Leases of Nonresidential Real Property, and (2) Abandon Any Personal Property Located at Such Leased Premises [Docket No. 7]* (the "Lease Rejection Motion"). On January 14, 2009, the Court entered an order [Docket No. 139] granting the Motion and approving the rejections.

**G.    Continuation of Customer Practices and Programs**

Prior to the Petition Date and in the ordinary course of their business, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. These practices included, but were not limited to: (a) a warranty program, (b) advertising and promotional credit programs, (c) a discount card program, and (d) gift certificate programs (the "Customer Programs"). The Customer Programs, which are commonplace among service providers similar to the Debtors,

create incentives for continuing and increased sales to the Debtors' customers. In order to maintain these programs, the Debtors, on the Petition Date, filed the *Motion for Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business [Docket No. 5]* (the "Customer Motion"). On December 10, 2008, the Court granted the Customer Motion and entered an order [Docket No. 43] that authorized the Debtors, in their business judgment, to continue, renew, replace, implement new, and/or terminate such of the Customer Programs as the Debtors deemed appropriate in the ordinary course of their business, without further application to the Court.

## H.    Retention of Key Professionals

The Debtors sought to employ and retain PSZ&J as their bankruptcy counsel with regard to the filing and prosecution of their Chapter 11 Cases. An order was entered authorizing that retention, effective as of the Petition Date, on January 12, 2009 [Docket No. 128].

The Debtor also sought to employ (a) Coffey Management Company ("CMC") to provide them with restructuring services, and (b) Stephen V. Coffey, the president of CMC, as their Chief Restructuring Officer, *nunc pro tunc* to the Petition Date, pursuant to section 327(a) of the Bankruptcy Code and on the terms set forth in the Debtors' retention application and the engagement letter between the Debtors and CMC. The Bankruptcy Court entered an order authorizing the retention, effective as of the Petition Date, on January 14, 2009 [Docket No. 143].

The Debtors also sought to retain Broadway Advisors, LLC, as their financial advisors and investment banker, *nunc pro tunc* to the Petition Date, pursuant to sections 327(a) and 328 of the Bankruptcy Code. An order [Docket No. 142] was entered authorizing that retention, effective as of the Petition Date, on December 14, 2009.

## I.    Ordinary Course Professionals

On the Petition Date, the Debtors filed the *Motion of the Debtors Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business [Docket No. 12]* (the "OCP Motion"). The Debtors sought approval of the OCP Motion in order to streamline the process by which they would be able to retain professionals who were involved in the ordinary course of the Debtors' operations, and who were not involved in the Chapter 11 Cases. The "Ordinary Course Professionals" consisted primarily of different professional firms that provided, among other things, various ongoing legal, tax and accounting, and computer services to the Debtors. On January 14, 2009, the Court entered an order authorizing the employment of ordinary course professionals using the procedures outlined by the Debtors [Docket No. 140].

## J.    Postpetition DIP Financing and Consensual Use of First Lien Lenders Cash Collateral

In order to meet their liquidity needs during the pendency of the Chapter 11 Cases, the Debtors sought approval of certain debtor in possession financing and consensual use of cash collateral with their First Lien Lenders.  To obtain approval of such postpetition financing and consensual use of cash collateral, the Debtors, on the Petition Date, filed the *Motion to Approve Interim Order (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtors' Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection to Pre-Petition First Lien Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, and (IV) Scheduling the Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Financing / Cash Collateral Motion").

On December 10, 2008, the Court entered an interim order [Docket No. 42] which, among other things, (a) authorized the requested postpetion financing, in an amount up to $2.5 million, (b) approved the limited use of cash collateral through January 9, 2009, and (c) granted certain liens, adequate protection, and other relief to the DIP Lenders.  The final hearing on the Financing / Cash Collateral Motion was held on January 12, 2009.  A final order granting the Financing / Cash Collateral Motion was entered on January 14, 2009 [Docket No. 144] (i.e. the Final Order).  The Final Order, among other things, authorized the Debtors to borrow up to $9 million of new money from the DIP Lenders, and "rolled up" nearly all the First Lien Obligations with the postpetition financing.  In order to obtain the financing and consensual use of cash collateral from the First Lien Lenders, the Debtors, among other things, waived any causes of actions of their Estates for the avoidance or disallowance of the First Lien Lenders' Claim.  The Committee's right to challenge the validity, enforceability, priority, perfection or amount of the First Lien Lenders' Claim or the liens asserted by the First Lien Lenders was preserved through February 20, 2009 (the "Challenge Deadline"), and has been further extended as described below.

## K.      Consensual Use of Second Lien Lenders' Cash Collateral

To help meet their liquidity needs, the Debtors sought approval of the consensual use the cash collateral of their Second Lien Lenders.  To obtain such approval, the Debtors, on the Petition Date, filed the *Motion (A) for Authorization to (I) Utilize Cash Collateral of the Second Lien Lenders Pursuant to 11 U.S.C. § 363 and (II) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 507; and (B) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001 [Docket No. 10]* (the "Cash Collateral Motion").  The Court subsequently entered interim [Docket No. 41] and final [Docket No. 145] orders approving the Debtors' consensual use of the Second Lien Lenders cash collateral.

In order to obtain the consensual use of cash collateral from the Second Lien Lenders, the Debtors, among other things, waived any causes of actions of their Estates for the avoidance or disallowance of the Second Lien Lenders' Claim.  The Creditors' Committee's right to challenge the validity, enforceability, priority, perfection or amount of the Second Lien Lenders' Claim or the liens asserted by the Second Lien Lenders was preserved through February 20, 2009 (i.e. the Challenge Deadline), and has been further extended as described below.

## L.      Bid Procedures and Sale

As noted above, when the Debtors filed the Chapter 11 Cases, they anticipated that substantially all of the Debtors assets would be sold as a going concern to a stalking horse purchaser or the proponent of a higher and better offer pursuant to an auction. Prior to the Petition Date, the Debtors had, in fact, entered into a proposed asset purchase agreement (the "APA") with EZ Lube Acquisition, LLC (the "Stalking Horse Purchaser"). Accordingly, on the Petition Date, the Debtors filed (a) a motion [Docket No. 22] (the "Bid Procedures Motion") to establish the bidding procedures (the "Bid Procedures") to be used in connection with the sale (the "Sale") of substantially all of the Debtors' assets, and (b) a motion [Docket No. 20] (the "Sale Motion") authorizing the Sale to the Stalking Horse Purchaser pursuant to the terms of the APA or to the proponent of a higher and better bid.

On January 14, 2009, the Court granted the Bid Procedures Motion and entered an order [Docket No. 146] (the "Bid Procedures Order") that approved certain bid procedures (the "Bid Procedures") to be used in connection with the Sale, and, among other things, established: (a) March 13, 2009, as the deadline for submitting bids (the "Initial Bid Deadline"); (b) March 26, 2009 as the deadline for filing objections to the Sale; (c) March 31, 2009, as the Auction; and (d) April 3, 2009 as the hearing date for the Sale Motion (the "Sale Hearing"). Prior to the expiration of the Bid Deadline, the Stalking Horse Purchaser requested that the Debtors agree to extend (a) certain of the Stalking Horse Purchaser's diligence deadlines pursuant to the terms of the APA, and (b) the Initial Bid Deadline pursuant to the terms of the Bid Procedures. The Debtors agreed to the requested extensions, and, on March 5, 2009, filed that certain *Notice of Extension of Bid Deadline* [Docket No. 251] (the "Extension Notice"). Pursuant to the Extension Notice, the Initial Bid Deadline was extended to March 27, 2009 (the "Extended Bid Deadline"). On March 25, 2009, the Stalking Horse Purchaser gave notice of its termination of the APA. The Debtors did not receive any other bids for the purchase of substantially all of the Debtors' assets after the expiration of the Extended Bid Deadline.

In light of the withdrawal of the APA by the Stalking Horse Purchaser, and the fact that no other parties submitted bids for the purchase of substantially all of the Debtors' assets, the Debtors continued the Sale Hearing and commenced pursuing other alternatives to maximize creditor outcomes in the Chapter 11 Cases.

## M.    Appointment of the Creditors' Committee

On December 22, 2008, at a meeting of the thirty-five(35) largest unsecured creditors of the Debtors held at the Office of the United States Trustee in Wilmington, Delaware, the U.S. Trustee appointed the Creditors' Committee as the representative of the Debtors' general unsecured creditor constituency in the Chapter 11 Cases. The Creditors' Committee was composed of: Camden Holdings, LLC; Exxon/Mobil Oil Corporation; Filpac, Inc.; A&S Engineering; ADX, Inc.; Miller & Co., Inc.; and Mailmark Direct. The Creditors' Committee retained Pepper Hamilton LLP as counsel and Executive Sounding Board Associates, Inc., as its financial advisors to assist in the Creditors' Committee's involvement in the Chapter 11 Cases.

## N.    Bar Date for Filing Proofs of Claim

On the Petition Date, the Debtors filed a motion [Docket No. 8] requesting that the Court set the deadlines by which parties, including governmental units, must file proofs of claim (the

"Bar Date Motion"). The Bar Date Motion was granted by the Court on January 12, 2009 [Docket No. 127] (the "Bar Date Order"), and (a) established March 19, 2009 as the deadline for all creditors (excluding governmental units) to file Proofs of Claim with the Court for any claims against the Debtors arising prior to the Petition Date (the "General Bar Date"), and (b) established June 7, 2009 as the deadline by which all governmental units must file Proofs of Claim with the Court for any claims against the Debtors arising prior to the Petition Date (the "Governmental Unit Bar Date"). A schedule of the filed Proofs of Claims is being maintained by KCC, the Debtor's notice, balloting, and claims agent.

## O.    **Filing of Statements and Schedules and Meeting of Creditors**

On January 8, 2009, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtors based on their books and records. The Debtors' meeting of creditors under section 341 of the Bankruptcy Code was held on January 16, 2009.

## P.    **Other Material Postpetition Activities**

Subsequent to the Petition Date, the Debtors have focused upon their operations, the proposed Sale, and, after the continuation of the Sale Hearing, the negotiation of the Plan. Additional material postpetition actions include, among other things:

### 1.    Rejection Of Certain Executory Contracts

The Debtors, as of the Date of the filing of the Disclosure Statement, have filed numerous motions [Docket Nos. 236, 293, 341, 344, 392, and 439] to reject various executory contracts and agreements which are burdensome or no longer necessary to the Debtors' ongoing operations.

### 2.    Extension of Deadline to Assume or Reject Unexpired Leases of Non-Residential Real Property

As noted above, when the Debtors filed the Chapter 11 Cases, they anticipated that substantially all of the Debtors assets would be sold to the Stalking Horse Purchaser or the proponent of a higher and better bid at the Auction. Pursuant to such a Sale, the majority, if not all, of the Debtors' unexpired leases of non-residential real property would have been assumed and assigned to the successful purchaser in connection with the Sale. As noted above, however, the Stalking Horse Purchaser terminated its APA and there were no bids for the purchase of substantially all of the Debtors' assets.

Pursuant to section 365(d)(4) of the Bankruptcy Code, an unexpired lease of non-residential real property under which a debtor is a lessee will be deemed rejected unless (a) the debtor assumes the lease by no later than 120 days after it files for bankruptcy (the "365(d)(4) Deadline"), or (b) the debtors obtains an extension of the 365(d)(4) Deadline from the bankruptcy court for cause. *11 U.S.C. § 365(d)(4)*. The bankruptcy court may only extend the 365(d)(4) Deadline for an additional 90 days, with any extensions thereafter require the written consent of the landlord. *Id.*

Given the termination of the APA by the Stalking Horse Purchaser, and the fact that no other parties submitted bids for the purchase of substantially all of the Debtors' assets, the Debtors filed a motion [Docket No. 296] (the "365(d)(4) Extension Motion") to extend their April 8, 2009, 365(d)(4) deadline for an additional 90 days through and including July 7, 2009. The Court entered an order [Docket No. 297] granting the 365(d)(4) Extension Motion on April 1, 2009.

### 3. Assumption of Unexpired Leases of Non-Residential Real Property

Since all of the Debtors operations are conducted on properties that the Debtors lease from various landlords, the Debtors cannot operate their business without the leased premises. On June 19, 2009, the Debtors filed a motion [Docket No. 413] (the "Assumption Motion") to assume 73 unexpired leases of non-residential real property. The Debtors filed the Assumption Motion in order to prevent the automatic rejection of their unexpired leases of non-residential real property pursuant to the operation of section 365(d)(4) of the Bankruptcy Code, and thereby ensure their ongoing operations for the benefit of Creditors. On July 2, 2009, the Court entered an order [Docket No. 446] granting the Assumption Motion and authorizing the assumption of the 73 leases (the "Assumed Leases").

### 4. The Standing Motion

On January 30, 2009, the Creditors' Committee filed that certain *Motion of the Official Committee of Unsecured Creditors for Order Granting Standing and Authority to Prosecute Causes of Action on Behalf of Debtors' Estates, or, in the Alternative, Extending the Committee's Time to Commence Causes of Action on Behalf of the Debtors' Estates [Docket No. 187]* (i.e. the Standing Motion). Pursuant to the Standing Motion, the Creditors' Committee alleged, among other things, that the claims and liens of the First Lien Lenders and Second Lien Lenders were potentially subject to avoidance as fraudulent transfers under 11 U.S.C. §§ 502(d), 544(b) and 550(a) and the California Uniform Fraudulent Transfer Act, Cal Civ Code § 3439 *et seq.* (2008). This was so, alleged the Creditors' Committee, because the Debtors did not receive reasonably equivalent value from the First Lien Lenders and the Second Lien Lenders in connection with the Merger. (See Article III(A)(3) above for a description of the Merger.) Pursuant to the Motion, the Committee sought standing to prosecute such potential causes of action against the First Lien Lenders and the Second Lien Lenders because the Debtors had waived their rights to do so in connection with obtaining the DIP Financing and consensual use of cash collateral, as described above.[86] In the alternative, the Creditors' Committee sought to have the Challenge Deadline extended.

Subsequent to the filing of the Standing Motion, the First Lien Lenders and the Second Lien Lenders have granted multiple extensions of the Challenge Deadline to the Creditors' Committee while the parties have engaged in discovery concerning the allegations raised in the Standing Motion. As of the filing of this Disclosure Statement, the Creditors' Committee has agreed to withdraw the Standing Motion ~~had not been adjudicated by the Court~~upon consummation of the Plan.

---

[86] The Debtors do not believe that they had valid fraudulent transfer claims against the First Lien Lenders or the Second Lien Lenders in connection with the Merger.

### 5. Extension of Postpetition DIP Financing

As noted above, the Bankruptcy Court entered a final order granting the Debtors' Financing / Cash Collateral Motion on January 14, 2009 (i.e. the Final Order). Pursuant to the Final Order, the term for the Debtors' postpetition financing expired on May 31, 2009. After the continuation of the Sale Hearing, the Debtors and the DIP Lenders engaged in discussions over extension of the terms for the Debtors' postpetition financing. As a result of such discussions, the terms of the financing and consensual use of cash collateral from the First Lien Lenders were amended and extended by (i) that certain First Amendment to Senior Secured Superpriority Debtor in Possession Credit Agreement, dated as of June 17, 2009, ~~and~~ (ii) that certain Second Amendment to Senior Secured Superpriority Debtor in Possession Credit Agreement, dated as of July 15, ~~2009. In addition, the Debtors have moved for approval of a proposed~~2009 and (ii) that certain Waiver and Third Amendment to Senior Secured Superpriority Debtor in Possession Credit Agreement ~~(the "Third Amendment") to extend the maturity date of the Debtors' postpetition financing through December 31, 2009, and the DIP Agent has agreed to continued use of cash collateral,~~ dated as of September 11, 2009 (the "Third Amendment"). In connection with Debtors' Motion for Order Approving (1) the Debtors' Agreement to Pay Third Amendment Backstop Fee in Connection With Extension of Post-Petition Financing and Exit Financing and (2) the Further Use of Cash Collateral, Pursuant to 11 U.S.C. Sections 363(b) and 503(b) [Docket No. 529], in connection with the Third Amendment, the Debtors are authorized to pay a backstop fee to the DIP Lenders in the event Debtors elect to fund a plan other than pursuant to the Exit Facilities and the DIP Lenders agreed to continue the Debtors' use of cash collateral on the terms set forth in the Final Order. In connection with the Second Lien Lenders' agreement to permit the continued use of cash collateral as requested in the Debtors' Cash Collateral Motion, the Debtor and DIP Lenders agreed to include in the Budget in exchange for their consent additional adequate protection payment to the Second Lien Lenders in the amount of $100,000 with respect to the continued use of cash collateral in which the Second Lien Lenders assert an interest.

## V.

## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES VI THROUGH VII BELOW. THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT THE PROPOSED PLAN OF REORGANIZATION. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

## VI.

## ADMINISTRATIVE CLAIMS, PROFESSIONAL
## FEES AND PRIORITY TAX CLAIMS

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following Claims in a Class:

### A.    Administrative Claims

Subject to the provisions of sections 330(a), 331, and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Claim shall be paid by the Debtors, at their election, in full, in cash, upon the latest of (i) the Effective Date or as soon thereafter as is reasonably practicable, (ii) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of such Debtor's business, consistent with past practices or (iii) such other, less favorable treatment as is agreed upon between the Holder of such Administrative Claim and the Debtors (or Reorganized EZ Lube). All Administrative Claims must be filed by no later than the Administrative Claims Bar Date.

Holders of Administrative Claims (including, without limitation, Professionals) requesting compensation or reimbursement of such expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code that have not filed such requests by the applicable deadlines provided for in the Plan shall be forever barred from asserting such claims against Reorganized EZ Lube, or its property. Notwithstanding any provision in the Plan regarding payment of Administrative Claims to the contrary, all Administrative Claims that are required to be filed and which are not filed by the Administrative Claim Bar Date shall be deemed disallowed and discharged. The Debtors shall request that the Court, in the Confirmation Order, set the Administrative Claims Bar Date for that date that is thirty (30) days after the service of the notice of the Effective Date.

All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date. Thereafter, Reorganized EZ Lube shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a final decree or an order converting or dismissing these Chapter 11 Cases.

### B.    Professional Fees

Reorganized EZ Lube shall pay Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date plus post-Effective Date fees approved by Reorganized EZ Lube.

The Bankruptcy Court must rule on and allow all Professional Fee Claims before the fees will be owed and paid. For all Professional Fee Claims, except Bankruptcy Clerk's Office fees, the fees and expenses of the Claims Agent, and U.S. Trustee's fees, the Professional in question must file and serve a properly noticed final fee application and the Bankruptcy Court must rule

on the application. Only the amount of fees and expenses Allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

Reorganized EZ Lube may retain and compensate professionals for services rendered following the Effective Date without order of the Bankruptcy Court. Such post-Plan Effective Date professionals shall provide Reorganized EZ Lube with monthly, detailed invoices in respect of their services and expenses, which may be paid by Reorganized EZ Lube without Bankruptcy Court approval. Notwithstanding the foregoing, if Reorganized EZ Lube objects in writing to the payment of any compensation, such disputed amount shall not be paid prior to the earlier of the resolution of such dispute or a ruling by the Bankruptcy Court.

Professionals requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Plan Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Plan Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. Nothing herein is meant to prohibit the allowance of professional fees for services performed by the Creditors' Committee in the post-Effective Date period in the circumstances permitted by Section 11.3 of the Plan.

## C.    Priority Tax Claims

Unless a Final Order otherwise provides, on the Effective  Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Priority Tax Claim shall be paid by the Debtors, in full and final satisfaction of such Holder's Allowed Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, (a) cash in an amount equal to the unpaid portion of such Allowed Claim, (b) payment of such Allowed Claim over a period not to exceed five (5) years plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date or such lesser rate as is agreed by a particular taxing authority, or (c) some other, less favorable treatment as is agreed upon by the Holder of such Allowed Priority Tax Claim and the Debtors (or Reorganized EZ Lube). Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.

## VII.

## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

## A.    Summary

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the

description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**B.    Classification and Treatment of Claims against the Debtor**

The classification of Claims and Equity Interests against the Debtor pursuant to the Plan, is as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 - Priority Non-Tax Claims | Impaired | Entitled to Vote |
| Class 2(a) - Pre-Petition Financing Claims of Non-Participating Pre-Petition Lenders | Unimpaired | Not Entitled to Vote |
| Class 2(b) - Pre-Petition Financing Claims of Participating Pre-Petition Lenders | Impaired | Entitled to Vote |
| Class 2(c) - DIP Claims of Non-Participating Lenders | Unimpaired | Not Entitled to Vote |
| Class 2(d) – DIP Claims of Participating DIP Lenders | Impaired | Entitled to Vote |
| Class 3 - Secured Claims of Second Lien Lenders | Impaired | Entitled to Vote |
| Class 4 – Miscellaneous Secured Claims | Unimpaired | Not Entitled to Vote |
| Class 5 - Claims of Mezzanine Debt Holders | Impaired | Entitled to Vote |
| Class 6(a) - Unsecured Claims (Convenience Class) | Impaired | Entitled to Vote |
| Class 6(b) - Unsecured Claims (Critical Trade Vendors) | Impaired | Entitled to Vote |
| Class 6(c) - Unsecured Claims (General Unsecured Creditors) | Impaired | Entitled to Vote |
| Class 7 – Interests | Impaired | Not Entitled to Vote |

1.    Class 1:

Classification:

Class 1 consists of the Priority Claims against the Debtors.

Treatment:

On the Effective Date, the Holders of Allowed Claims in Class 1 shall be paid by Debtors in full and complete satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Priority Non-Tax Claims (a) all amounts to which such Holder is entitled on account of such Allowed Claim (without interest) on the later of (i) the Distribution Date or as

soon thereafter as is reasonably practicable, and (ii) the due date thereof in accordance with its terms, or (b) such other, less favorable treatment as is agreed upon by the Holder of such Allowed Priority Non-Tax Claim and the Debtors (or Reorganized EZ Lube).

Voting:

Class 1 is an impaired Class and Holders of Class 1 Claims are entitled to vote on the Plan.

2.  Class 2:

2(a)    Class 2(a):

Classification:

Class 2(a) consists of the Pre-Petition Financing Claims of Non-Participating Pre-Petition Lenders.

Treatment:

The Non-Participating Pre-Petition Lenders shall be paid by the Debtors (from the proceeds of the Exit Facilities or otherwise) on the Effective Date, in full and complete satisfaction, settlement, release of, and in exchange for their respective Pre-Petition Financing Claims, cash in an amount equal to the unpaid portion of such Non-Participating Pre-Petition Lender's Allowed Pre-Petition Financing Claims to the extent not paid prior to the Effective Date.

Voting:

Class 2(a) is an unimpaired Class and Holders of Class 2(a) Claims are not entitled to vote to accept or reject the Plan.

2(b)    Class 2(b):

Classification

Class 2(b) consists of the Pre-Petition Financing Claims of Participating Pre-Petition Lenders.

Treatment:

The Participating Pre-Petition Lenders shall receive on the Effective Date, in full and complete satisfaction, settlement, release of, and in exchange for their respective Pre-Petition Financing Claims, distributions of their respective Ratable Portion of the Preferred Units. The number of Preferred Units distributable to each Participating Pre-Petition Lender shall be determined based upon the ratio of the amount of Pre-Petition Financing Claims held by each Participating Pre-Petition Lender compared to the total amount of Pre-Petition Financing Claims of all Participating Pre-Petition Lenders, the DIP Claims of all Participating DIP Lenders to the

extent such DIP Claims exceed $40,000,000 in the aggregate and the Exit Facilities Fee Amounts.

Voting:

Class 2(b) is an impaired Class and Holders of Class 2(b) Claims are entitled to vote to accept or reject the Plan. Pursuant to that certain Commitment Letter, dated as of September 24, 2009, GSSLH as the holder of all outstanding Pre-Petition Financing Claims has provided its commitment, subject to the terms of the Commitment Letter, to elect to have all such claims treated as Class 2(b) Claims and to vote to accept the Plan.

### 2(c)    Class 2(c):

Classification

Class 2(c) consists of the DIP Claims of Non-Participating DIP Lenders.

Treatment:

The Non-Participating DIP Lenders shall be paid by the Debtors (from the proceeds of the Exit Facilities or otherwise) on the Effective Date, in full and complete satisfaction, settlement, release of, and in exchange for their respective DIP Claims, cash in an amount equal to the unpaid portion of the DIP Claims of such Non-Participating DIP Lender to the extent unpaid prior to the Effective Date.

Voting:

Class 2(c) is an unimpaired Class and Holders of Class 2(c) Claims are not entitled to vote to accept or reject the Plan.

### 2(d)    Class 2(d):

Classification:

Class 2(d) consists of the DIP Claims of Participating DIP Lenders.

Treatment:

The Participating DIP Lenders shall convert and/or receive on the Effective Date, in full and complete satisfaction, settlement, release of and in exchange for, their respective DIP Claims: (i) to the extent of such Participating DIP Lender's Ratable Portion of the DIP Claims of all Participating DIP Lenders equaling $40,000,000, such DIP Claims shall on the Effective Date (and without further actions by the parties) be converted into loans and commitments under the Exit Facilities and such loans and commitments shall remain outstanding in accordance with (and be secured by all collateral pledged in respect of) the Exit Facilities; and (ii) to the extent such Participating DIP Lenders Ratable Portion of the DIP Claims of all Participating DIP Lenders which are in excess of $40,000,000, the Debtors shall on the Effective Date issue to each such Participating DIP Lender their respective Ratable Portion of the Preferred Units on account of such excess. The number of Preferred Units distributable to each Participating DIP Lender shall

be determined based upon the ratio of the amount of DIP Claims held by such Participating DIP Lender compared to the total amount of Pre-Petition Financing Claims of all Participating Pre-Petition Lenders, the DIP Claims of all Participating DIP Lenders to the extent such DIP Claims exceed $40,000,000 in the aggregate and the Exit Facilities Fee Amounts.

Voting:

Class 2(d) is an impaired Class and Holders of Class 2(d) Claims are entitled to vote to accept or reject the Plan. Pursuant to that certain Commitment Letter, dated as of September 24, 2009, GSSLH as the holder of all outstanding DIP Claims has provided its commitment, subject to the terms of the Commitment Letter, to elect to have all such claims treated as Class 2(d) Claims and to vote to accept the Plan.

3. Class 3:

Classification:

Class 3 consists of Claims of the Secured Claims of Second Lien Lenders.

Treatment:

On the Effective Date, the Holders of the Second Lien Claims shall receive in full and complete satisfaction, discharge and release of, and in exchange for, of such Second Lien Lender's Allowed Second Lien Claims, a distribution of their respective Ratable Portion of the Common Units. The number of Common Units distributable to each Second Lien Lender shall be determined based on the ratio of the amount of the Allowed Second Lien Claims held by such Second Lien Lender compared to the total amount of all Allowed Second Lien Claims, Allowed Mezzanine Debt Claims and Allowed Class 6(b) and 6(c) Unsecured Claims.

Voting:

Class 3 is an impaired Class and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan. The Second Lien Lenders have agreed to support the Plan and indicated their intention to vote all of the Second Lien Claims to accept the Plan.

4. Class 4:

Classification:

Class 4 consists of the Miscellaneous Other Secured Claims.

Treatment:

To the extent any Class 4 Claimant exists, at the option of Reorganized EZ Lube, as applicable, (i) each Holder (if any) of an Allowed Class 4 Claim shall receive on the Distribution Date or as soon thereafter as practicable cash in an amount equal to the value of the Creditor's

interest in the collateral securing such Claim in full and complete satisfaction of such Claim, or (ii) the collateral securing such Creditor's Claim shall be abandoned to such Creditor, in full and complete satisfaction of such Claim.

Voting:

Class 4 is an unimpaired Class and Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan.

5.    Class 5:

Classification:

Class 5 consists of the Holders of Mezzanine Debt Claims.

Treatment:

On the Effective Date, the Holders of Mezzanine Debt Claims shall receive in full and complete satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Mezzanine Claims, a distribution of their respective Ratable Portion of the Common Units. The number of Common Units distributable to each Holder of Allowed Mezzanine Debt Claims shall be determined based on the ratio of the amount of such Holder's Allowed Mezzanine Debt Claims compared to the total amount of all Allowed Second Lien Claims, Allowed Mezzanine Debt Claims, and Allowed Class 6(b) and Class 6(c) Unsecured Claims.

Voting:

Class 5 is an impaired Class and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan. The Mezzanine Debt Holders have agreed to support the Plan and indicated their intention to vote all of the Mezzanine Debt Claims to accept the Plan.

6.    Class 6

**6(a)**        **Class 6(a):**

Classification:

Class 6(a) is comprised of Unsecured Creditors (i) holding Allowed General Unsecured Claims with an aggregate value not to exceed $5,000 or (ii) who elect to reduce all of their General Unsecured Claims to $5,000 and accept treatment in Class 6(a) in lieu of treatment in Class 6(c).

Treatment:

Class 6(a) Unsecured Creditors will receive on the Distribution Date in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Holder's Class 6(a) Unsecured Claims, cash distributions in an amount equal to twenty-five percent (25%) of such Holder's Allowed Class 6(a) Unsecured Claims.

Voting:

Class 6(a) is an impaired Class and Holders of Class 6(a) Claims are entitled to vote to accept or reject the Plan.

**6(b)         Class 6(b):**

Classification:

Class 6(b) is comprised of critical trade vendors (as determined by the Debtors, in their sole discretion) who (i) are Unsecured Creditors holding Allowed General Unsecured Claims, (ii) are included on Schedule 5.6(b), which is attached hereto as Exhibit C, (iii) have agreed to accept treatment in Class 6(b) in lieu of treatment in Class 6(c), and (iv) agree in writing to provide Reorganized EZ Lube acceptable trade terms for periods following the Effective Date.

Treatment:

Class 6(b) Unsecured Creditors will, in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Holder's Class 6(b) Unsecured Claims, receive the following:

> i.      on the Effective Date, (I) the Plan Trust, on behalf of the Holders of Allowed Class 6(b) Claims shall receive in full and complete satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Class 6(b) Claims, a distribution of the respective Ratable Portion of the Common Units. The number of Common Units distributable to the Plan Trust on behalf of the Holder of Allowed Class 6(b) Claims shall be determined based on the ratio of the amount of the aggregate amount of Allowed Class 6(b) Claims compared to the total amount of all Allowed Second Lien Claims, Allowed Mezzanine Debt Claims, and Allowed Class 6(b) and Class 6(c) Unsecured Claims and (II) each Holder of Allowed Class 6(b) Claims shall receive distributions of such Class 6(b) Unsecured Creditor's Ratable Portion of beneficial interests in the Plan Trust (as described in Section 6.1(c) of the Plan); and

> ii.      to the extent (X) Class 6(b) has voted to approve the Plan and (Y) Reorganized EZ Lube's post-Effective Date financial performance (as evidenced by delivery by Reorganized EZ Lube of financial statements) generates as of the end of any calendar quarter occurring on or after the Effective Date trailing twelve month EBITDA equal to or greater than $12,500,000 (the last day of the calendar quarter on which such trigger is achieved being the "Class 6(b) Trigger Date"), each Class 6(b) Unsecured Creditor shall receive, through payments to the Plan Trust, on the Business Day that is the earliest of either (1) the later to occur of (I) the date which is 180 days following the Class 6(b) Trigger Date or (II) the second anniversary of the Effective Date, or (2) any Sale Event Payment Date (the earlier of such dates, if any, being a "Class 6(b) Payment Date"), cash

distributions in an amount equal to seven and one-half percent (7.50%) of such Class 6(b) Unsecured Claims Holder's Allowed Class 6(b) Unsecured Claims (collectively, the "Class 6(b) Distribution Amounts").

Notwithstanding the foregoing, in the event Class 6(b) has voted to approve the Plan, and in the event of the consummation of the sale of Reorganized EZ Lube or all or substantially all of the assets of Reorganized EZ Lube, regardless of whether the transaction is in the form of a sale, a merger or otherwise (a "Sale Event") on or before the Class 6(b) Payment Date, in lieu of the payment of any Class 6(b) Distribution Amounts, Class 6(b) Unsecured Creditors will receive (whether or not a Class 6(b) Trigger Date has occurred), through payments to the Plan Trust for the benefit of such Class 6(b) Unsecured Creditors, not later than the Business Day first occurring on or after the 30th day following consummation of such Sale Event (a "Sale Event Payment Date"), cash distributions in an amount equal to Class 6(b) Distribution Amounts in the event such Sale Event generates gross proceeds of not less than $75,000,000 (collectively, the "Alternative Class 6(b) Distribution Amounts"). For purposes of greater certainty, the receipt of Alternative Class 6(b) Distribution Amounts are intended to be in lieu of (and not in addition to) the payment of any Class 6(b) Distribution Amounts (whether or not a Class 6(b) Trigger Date has occurred). In light of the foregoing, the payment of Alternative Class 6(b) Distribution Amounts shall, in each case, be reduced by an amount equal to any Class 6(b) Distribution Amounts actually paid to or on behalf of the Holders of Allowed Class 6(b) Unsecured Claims.

In the event Class 6(b) has voted to approve the Plan and a Sale Event occurs following a Class 6(b) Trigger Date but prior to a Class 6(b) Payment Date, (i) if such Sale Event gives rise to Alternative Class 6(b) Distribution Amounts, Class 6(b) Unsecured Creditors shall receive, through payments to the Plan Trust for the benefit of such Class 6(b) Unsecured Creditors, the Alternative Class 6(b) Distribution Amounts on the Sale Event Payment Date, and (ii) if such Sale Event does not give rise to an Alternative Class 6(b) Distribution Amount, Class 6(b) Unsecured Creditors shall receive, through payments to the Plan Trust for the benefit of such Class 6(b) Unsecured Creditors, the Class 6(b) Distribution Amounts on the Sale Event Payment Date.

For purposes of greater certainty, any distributions made to the Plan Trust on account of its ownership of Common Units of Reorganized EZ Lube shall not result in a reduction in the Class 6(b) Distribution Amounts or the Alternative Class 6(b) Distribution Amounts.

In addition, to the extent (i) Class 6(b) has voted to approve the Plan and (ii) Class 6(c) has not voted to approve the Plan, the Class 6(b) Unsecured Creditors shall also receive, through payments to the Plan Trust for the benefit of such Class 6(b) Unsecured Creditors, the amounts, if any, that would have been payable to Class 6(c) Unsecured Creditors on account of the Class 6(c) Distribution Amounts or the Alternative Class 6(c) Distribution Amounts, as applicable, as described below.

Voting:

Class 6(b) is an impaired Class and Holders of Class 6(b) Claims are entitled to vote to accept or reject the Plan.

**6(c)**       **Class 6(c):**

Classification:

Class 6(c) is comprised of all other Unsecured Creditors holding Allowed General Unsecured Claims, including, without limitation, the Claims of landlords arising from the Debtors' rejection of leases during the Chapter 11 Cases, and all prepetition claims (other than Second Lien Claims, Mezzanine Debt Claims, Convenience Class Claims or Critical Trade Vendor Claims).

Treatment:

Class 6(c) Unsecured Creditors will, in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Holder's Class 6(c) Unsecured Claims, receive the following:

     i.       on the Effective Date, (I) the Plan Trust, on behalf of the Holders of Allowed Class 6(c) Claims shall receive in full and complete satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Class 6(c) Claims, a distribution of the respective Ratable Portion of the Common Units. The number of Common Units distributable to the Plan Trust on behalf of the Holder of Allowed Class 6(c) Claims shall be determined based on the ratio of the amount of the aggregate amount of Allowed Class 6(c) Claims compared to the total amount of all Allowed Second Lien Claims, Allowed Mezzanine Debt Claims, and Allowed Class 6(b) and Class 6(c) Unsecured Claims and (II) each Holder of Allowed Class 6(c) Claims shall receive distributions of such Class 6(c) Unsecured Creditor's Ratable Portion of beneficial interests in the Plan Trust (as described in Section 6.1(c) of the Plan); and

     ii.       to the extent (X) Class 6(c) has voted to approve the Plan and (Y) Reorganized EZ Lube's post-Effective Date financial performance (as evidenced by delivery by Reorganized EZ Lube of financial statements) generates as of the end of any calendar quarter occurring on or after the Effective Date trailing twelve month EBITDA equal to or greater than $12,500,000 (the last day of the calendar quarter on which such trigger is achieved being the "Class 6(c) Stage I Trigger Date"), each Class 6(c) Unsecured Creditor shall receive, through payments to the Plan Trust, on the Business Day that is the earliest of either (1) the later to occur of (I) the date which is 180 days following the Class 6(c) Stage I Trigger Date, or (II) the second anniversary of the Effective Date or (2) any Sale Event Payment Date (the earlier of such dates, if any, being a "Class 6(c) Stage I Payment Date"), cash distributions in an amount equal to the lesser of: (A) such Class 6(c) Unsecured Claims Holder's Ratable Portion of $220,000 or (B) one and six-tenths percent (1.60%) of such Class 6(b) Unsecured Claims Holder's Allowed Class 6(c) Unsecured Claims (collectively, the "Class 6(c) Stage I Distribution Amounts"); and